**HOTEL EMPLOYEES RESTAURANT EMPLOYERS INTERNATIONAL UNION LOCAL 54, Plaintiffs,**

**v.**

**ELSINORE SHORE ASSOCIATES d/b/a Atlantis Hotel and Casino, et al., Defendants.**

**Daniel L. FINKLER, et al., on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**ELSINORE SHORE ASSOCIATES d/b/a Atlantis Hotel and Casino, et al., Defendants.**

**Civ. A. Nos. 89–2143 (MHC), 89–2330 (MHC).**

United States District Court, D. New Jersey.

Aug. 20, 1991.

Tomar, Simonoff, Adourian & O'Brien by Theodore M. Lieverman, Haddonfield, N.J., for plaintiffs.

Saiber, Schlesinger, Satz & Goldstein by William F. Maderer, Philip Touitou, Gregg Sodini, Newark, N.J., for defendants.

GERRY, Chief Judge:

These consolidated actions arise out of the May 22, 1989 closing of the Atlantis Casino Hotel in Atlantic City, New Jersey. Presently before the court is defendants' motion for summary judgment. The issue presented by this motion, one of first impression, is whether an employer may be subject to liability under the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. section 2101 *et seq.* (West Supp.1991), for failing to provide employees with the sixty days advance notice of closing required under that act, where the closing was ordered by a state regulatory agency. For the reasons set forth below, we hold that under the facts of this case, defendants did not "order a plant closing" within the meaning of 29 U.S.C. section 2102. Accordingly, defendants' motion will be granted.

## I. BACKGROUND

Although this court has previously set forth some of the relevant facts of this case in considering defendants' respective motions to dismiss, *see Finkler v. Elsinore Shore Associates*, 725 F.Supp. 828 (D.N.J.1989); *Hotel Employees Restaurant Employees International Union Local 54 v. Elsinore Shore Associates*, 724 F.Supp. 333 (D.N.J.1989), we will set forth below the pertinent facts for the purposes of this motion.

Defendants Elsinore Shore Corporation (Elsinore), a Nevada corporation, and other related entities [1] are the partners of Elsinore Shore Associates (ESA), a New Jersey partnership that owned and operated the Atlantis Hotel Casino (the Atlantis) in Atlantic City, New Jersey. As of May 17, 1989, defendants employed approximately 1,800 employees at the Atlantis. The plaintiffs are former employees of the Atlantis and their representative union.

Casino gambling in New Jersey is authorized and heavily regulated under the provisions of the Casino Control Act (the Act), *N.J.Stat.Ann.* § 5:12-1 *et seq.* (West 1988). General responsibility for implementing the Act is vested in the Casino Control Commission (the Commission). *Id.* § 5:12-63. Among other powers and responsibilities, the Commission adjudicates all applications for license and registration under the Act, as well as petitions for suspension, revocation or renewal. The Division of Gaming Enforcement (DGE) of the New Jersey Department of Law and Public Safety serves as an investigatory and enforcement body for all proceedings before the Commission, and prosecutes all proceedings for violations of the Act. *Id.* § 5:12-76.

An applicant seeking a license to operate a casino must meet strict requirements under the Act, such as ownership or long-term lease of a hotel at which the casino will operate, and incorporation and mainte-

---

**1.** In particular, ESA had two general partners, Elsinore of Atlantic City (EAC), a New Jersey limited partnership, and Elsub Corporation (Elsub), a New Jersey corporation. Elsinore of New Jersey, Inc. (ENJ), a New Jersey corporation, was the sole general partner of EAC. ENJ was wholly owned by Elsub, which in turn was primarily owned by Elsinore. Elsinore Finance Corporation (EFC), a New Jersey corporation, was a wholly-owned subsidiary of Elsinore. Jeanne Hood was the President and Chief Executive Officer of Elsinore and Chairperson of the ESA Executive Committee.

nance of all operating accounts in New Jersey. *Id.* § 5:12–82. Additionally, every applicant must establish by clear and convincing evidence his or her financial stability, integrity and responsibility, and must agree to inspection of all financial records by the Commission or DGE. *Id.* § 5:12–84. The applicant must establish the personal and financial integrity of all financial backers, investors, mortgagees, bond holders and holders of debt which bear any relation to the casino. *Id.* Further, the applicant must demonstrate that it can create and maintain a successful, efficient casino operation which will not adversely affect current casino operations or overall environmental conditions. *Id.*

Licenses are issued for a one year period, may be renewed for a period of one year for the first two renewal periods, and generally are renewed for a period of two years thereafter. *Id.* § 5:12–88. Where a casino license is revoked or suspended, the Commission may appoint a conservator to take possession and control of the licensee's property in order to preserve the assets and to attempt to continue to operate the casino on a sound and businesslike basis. *Id.* § 5:12–130.2. Once appointed, the conservator is vested with the title of all the property of the former licensee relating to the casino and hotel, subject to any valid liens, claims and encumbrances. *Id.* § 5:12–130.2(a). The conservator is afforded broad powers, subject to modification by the Commission. *Id.* § 5:12–130.2(b)(1)–(7), (d).

Plaintiffs depict a detailed account of financial difficulty experienced by defendants since 1985 which ultimately led to the casino's demise in 1989. In 1984, the name of the casino was changed from Playboy Hotel & Casino to Atlantis Casino Hotel. That year the Atlantis realized an operating profit of $14.2 million. Trouble began in 1985, however, allegedly due to increased competition and low name recognition. In 1985 defendants' gross revenues decreased by 9.2% and the Atlantis experienced a net operating loss of $8.2 million. Consequently, in November, 1985 a creditor

filed an involuntary petition under Chapter 11 of the Bankruptcy Code against Elsub.[2] Shortly thereafter, EAC filed a voluntary petition for reorganization of ESA under Chapter 11.

The Commission renewed ESA's license for a one-year period in April, 1986. However, possibly as a result of the Chapter 11 proceedings, the Commission imposed numerous requirements on defendants. For example, ESA was required to maintain a cash balance of at least $3 million for casino operations, and ESA was required to submit monthly balance sheets, statements of income, statements of cash flow, and changes in components of working capital. Additionally, ESA was required to prepare daily operating reports and cash reports for the Commission and the DGE. The Commission also required ESA and Elsinore to immediately notify the Commission and the DGE of any change in the conditions of or use of any credit lines, and to maintain necessary accounts to satisfy payroll and related employee benefits.

Revenues at ESA decreased by 19.4% for the twelve months ending December 31, 1986. The Commission renewed ESA's license, again for a one-year period, in April, 1987, and imposed substantially the same conditions as were imposed the previous year. On July 24, 1987, EFC, ENJ, EAC and Elsub all filed voluntary petitions under Chapter 11 to facilitate the reorganization of ESA.

Casino revenue decreased substantially again in 1987. On March 25, 1988, ESA's accountants, Laventhol and Horwath, issued its statement of ESA's operations for calendar years 1985 through 1987, and noted that as of December 31, 1987, current liabilities exceeded current assets by $270,623,000. It stated that ESA was in default on substantially all of its debt and concluded that "these factors, among others, indicate that the partnership may be unable to continue in existence." *See,* Exhibit 11 of Plaintiffs' Appendix to its Memorandum in Opposition, at 1673 [hereinafter "P.Ex."]. In spite of these difficulties, on September

---

**2.** *See* note 1, *supra.*

30, 1988, the debtors were discharged from bankruptcy under an approved plan of reorganization.

The casino's financial condition continued to deteriorate in 1988. Although revenues increased, ESA reported a net loss of $26,-672,111. In April, 1988, the Commission renewed ESA's license, but only for one year although it was eligible for a two-year license. The Commission continued the conditions imposed the previous year, in addition to imposing new requirements. For example, the Commission ordered that the license hearing would automatically be reopened should ESA's cash position fall below $6 million for five working days. Additionally, it required Elsinore to make additional funding available to ESA if working capital fell below $7 million. Beginning January 17, 1989, the DGE began monitoring ESA's cash position on a daily basis. On several occasions, ESA's accounts fell below the required levels.

ESA filed an application for its 1989 license renewal on December 15, 1988. On March 13, 1989, the Commission's Division of Financial Evaluation and Control issued a report which concluded that ESA had not demonstrated adequate financial stability. The Commission conducted various hearings between March 27, 1989 and May 16, 1989 to determine whether to renew ESA's casino license and to determine whether a conservator should be appointed. At the April 3, 1989 hearing, counsel for the Atlantis testified that ESA intended to sell the casino, preferably within sixty days. *See*, P.Ex. 25, at 390–91. ESA therefore opposed the appointment of a conservator since, in their view, this would make it difficult to sell the casino as a going concern. Alternatively, counsel testified, if no buyer could be found within the sixty day period, the company intended to dispose of the casino by auction in order to satisfy creditors. *Id.*, at 301. Jeanne Hood, the President and Chief Executive Officer of Elsinore, testified that a sale was imminent, and noted that it was well known that Elsinore did not have the resources to make the Atlantis "a very profitable, viable property." P.Ex. 26, at 610–11.

On April 7, 1989 the Commission voted not to renew ESA's license and appointed Joseph M. Nolan as conservator. The Commission thereafter conducted hearings to determine what powers, duties and responsibilities were appropriate for the conservator. Chairman Read stated that the conservator need not undertake many of the activities authorized under the Act, and that the conservator "should, in the spirit of limiting the problems of transition, exercise restraints." P.Ex. 30, at 990. The Commission's Order, dated April 19, 1989, provides that "the regular and normal operations of the casino hotel shall be conducted by ESA under the general guidance and oversight, but without specific review or approval of the conservator, pending the sale of the casino hotel...." D.Ex. B, at 2. The conservator was authorized to assess and monitor ESA's financial situation and to report to the Commission if ESA could no longer remain financially viable. ESA was required to make all books and records available to the conservator, and was prohibited from taking any significant actions, including sale of the property, without first notifying the conservator. The conservator, in turn, was authorized to sell the property subject to prior approval of the Commission. *Id.*, at 3. As this court previously observed,

> [i]t appears that the Commission implemented a system of checks and balances, pending the sale of the Atlantis, in order to assure that defendants met minimum regulatory standards, without unduly disrupting day to day operations. The checks and balances served to curb any major action on the part of the defendants and the Conservator, but the daily operation was handled by defendants.

*Finkler v. Elsinore Shore Associates*, 725 F.Supp. at 832.

The defendants had been negotiating for the sale of the Atlantis with Donald Trump shortly before the Commission's Order was issued. On April 15, 1989 Atlantis and Trump issued a joint press release announcing that Elsinore and Trump had entered into a purchase agreement. The release stated that, according to Jeanne Hood, the casino operation at the Atlantis

would be closed in the near future. P.Ex. 17, at 491. In fact, section 7.05 of the Purchase and Sale Agreement dated April 14, 1989, provides that "Seller intends, and is presently taking steps, to close the casino located in the Hotel and discontinue all gambling and gaming activities in the Hotel on or before the expiration of [the] due diligence period granted to Purchaser...." P.Ex. 1, at 25.[3] In a memo to employees outlining the implications of the sale to Atlantis employees, Hood stated that "the Atlantis casino will eventually be closed. Once the CCC denied our license, it became a foregone conclusion that the gaming operations would not be able to continue." P.Ex. 44.

In her testimony before the Commission on April 17, 1989, however, Ms. Hood stated that at that time, although ESA inevitably intended to close the casino as long as the sale went through, no definite date for the closing was set. P.Ex. 32, at 1098–99. When questioned further about ESA's plans to close the casino, Hood identified two considerations that ESA had to look into before the casino could be closed. First, she indicated that they were unsure what steps were required from the Commission and the DGE in light of the conservatorship. *Id.* at 1099. Additionally, Hood testified that the Purchase Agreement provided for "an orderly winddown of operations and helping employees find comparable work elsewhere...." *Id.*

During the hearings on April 18, 1989, Satz indicated that ESA was not contractually obligated to close the casino, but rather ESA intended to keep the casino in operation until the closing. P.Ex. 34, at 1310. On May 4, 1989, Bruce McKee, ESA's Vice–President in charge of finance, informed the Commission that upon payment of ESA's bankruptcy counsel and outstanding licensing fees, there would be insufficient cash for operating needs without utilization of funds currently maintained in restricted accounts. On May 10, 1989, the DGE filed a motion and verified petition with the Commission, seeking a determination as to whether the casino operations should be terminated. *See* D.Ex.D. According to the DGE, ESA did not make its latest $1.8 million interest payment to bondholders, contrary to previous assurances given to the Commission. Additionally, the operating results of the Atlantis for March, April and May were "severely depressed" from what the company had forecast.

During the May 12, 1989 hearings, the Commission and Satz seemed to go back and forth on the issue of whether ESA could make the determination to close the casino, or rather whether only the Commission or the conservator could take such action. Additionally, despite numerous inquiries from the Commissioners, ESA would take no position as to whether it planned on keeping the casino open. It is evident that ESA sought to keep the casino open for at least a short period of time, however, since they sought to have the minimum level of cash reserves reduced. *See* P.Ex. 35.

Counsel for the conservator testified on May 15, 1989 and took the position that the casino should remain open until May 28 or 29, and that the restriction imposing a $6 million level of cash reserves should be reduced.[4] P.Ex. 36, at 179–80. The DGE sought to have the casino closed by May 22. *Id.*, at 195. Satz, on behalf of ESA, took no position as to whether the Commission should close the casino. *Id.*

---

3. Ms. Hood testified that this provision indicated that the casino was to close by April 18, 1989. P.Ex. 32, at 1083. The Commission asked ESA's attorney, David Satz, which party requested the provision. By letter dated April 21, 1989, Satz responded that the section was intended as an inducement for Mr. Trump to enter into the Purchase and Sale Agreement, since Trump could only hold three casino licenses pursuant to the Casino Control Act. *See,* P.Ex. 45.

4. Counsel also noted that "something we should all be mindful of" was the existence of WARN and its financial penalties for failure to comply with the new statute. P.Ex. 36, at 181. The DGE took the position that "the regulatory authorities in New Jersey have their own responsibility, federal labor laws notwithstanding." *Id.*, at 194.

On May 16, 1989, the Commission concluded that the casino could no longer be operated on a sound and businesslike basis, and unanimously voted in favor of closing the casino by 4:00 a.m. on May 22, 1989. P.Ex. 37, at 212–13. An order was issued on May 18, 1989. D.Ex.E Accordingly, Jeanne Hood sent a memo to all casino employees on May 16, 1989, announcing the Commission's decision. D.Ex.F. Each of the plaintiffs were given notice on either May 16 or 17, 1989 that their positions were eliminated. *See* D.Ex.G (sample notice).

## II. SUMMARY JUDGEMENT STANDARD

The standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56 is a stringent one. Summary judgment is appropriate only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). *See, e.g., Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir. 1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In determining whether there remain any genuine issues of material fact, the court must resolve all reasonable doubt in favor of the nonmoving party. *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismd.*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). Significantly, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Under the standards announced by the Supreme Court's trilogy in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. 242, 106 S.Ct. 2505; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, at 247–48, 106 S.Ct. at 2510 (emphasis in original). A disputed fact is "material" only if it would affect the outcome of the suit. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Where the moving party has made a properly supported motion for summary judgment, it is incumbent upon the nonmoving party to come forward with specific facts to show that there is a genuine issue of material fact for trial. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Thus, once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor, *id.*, 477 U.S. at 249, 106 S.Ct. at 2510; *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring), and not just "some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Moreover, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990).

## III. APPLICABILITY OF WARN

WARN, which became effective in February of 1989, provides in relevant part that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order...." 29 U.S.C. § 2102(a). The statute provides aggrieved employees with a cause of action for back pay, lost benefits, civil penalties in

some cases, and reasonable attorneys fees. *Id.* § 2104. Additionally, WARN provides three exceptions which, if applicable, permit a reduction of the notification period. The "unforeseen business circumstances" exception allows for reduced notice where "the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." *Id.* § 2102(b)(2)(A). The "faltering business" exception allows for reduced notice where the employer is seeking capital and reasonably and in good faith believes that giving the notice would prevent the employer from obtaining the needed capital or business. *Id.* § 2102(b)(1). Additionally, an employer is not required to give advance notice to a plant closing or mass layoff that was due to natural disaster. *Id.* § 2102(b)(2)(B).

The parties rely extensively on WARN's legislative history. Although the defendants contend that WARN is inapplicable on its face, they maintain, *inter alia,* that Congress did not intend for WARN to apply in cases of government-ordered closings. Plaintiffs, in contrast, contend that Congress did not intend to exempt government-ordered closings unless the closing qualified for a reduction in notice under of the unforeseen business circumstances exception. Plaintiffs further contend that defendants cannot avail themselves of this exception since they reasonably should have foreseen that the financial condition was such that the casino would be closed.

### A. The Statute's Plain Language

█ Under the plain language of the statute, defendants cannot be said to have "ordered a plant closing." Although defen-

dants were the ones who actually implemented the Commission's decision to close the Atlantis, it was the Commission and not the defendants who ultimately "ordered" the closing. Plaintiffs have submitted evidence which supports their contention that, in all likelihood, the casino would have been closed even in the absence of the Commission's order and that defendants should have surmised that the Commission would intervene and order the casino to close. Had the defendants in fact ordered the closing, they would have been held accountable under WARN. However, the defendants not having ordered the closing, it will not do to say that they would have violated the statute; for any number of factors could have intervened wherein defendants would not have incurred liability.[5] Moreover, defendants could not have conclusively known that the Commission would close the casino. In fact, it appears that this was the first time the Commission had ever taken such action. To the extent that defendants reasonably should have known that the Commission was going to involuntarily shut down the casino, the statute simply does not impose liability unless the *employer* orders the closure. We note that the statute could just as easily have provided that "an employer shall serve written notice of a plant closing or mass layoff at least 60 days prior to an anticipated closing or layoff ..." rather than *"[a]n employer shall not order a plant closing or mass layoff until...."* Although the distinction may be a fine one, the legislative history discussed below leads us to conclude that Congress intentionally identified the employer as the entity which must order the plant closing or mass layoff in order to be held accountable under the statute. Thus,

---

**5.** For example, the defendants could have given sixty days notice and continued to operate at a loss in order to avoid an even greater loss that would have resulted in light of their potential WARN liability. It is noteworthy that plaintiffs' expert states his professional opinion that "the Atlantis would have survived no more than two or three months, even if its license had been renewed." P.Ex., at ¶ 15. This, however would have been enough time to satisfy WARN's notice requirement since defendants could have given notice and remained open for sixty days. Alter-

natively, defendants could have negotiated for the employees' reemployment with the Trump organization, relieving them of their WARN obligations altogether. *See,* 29 U.S.C. § 2101(b)(1) ("[i]n the case of a sale of part or all of an employer's business, ... [a]fter the effective date of the sale ..., the purchaser shall be responsible for providing notice for any plant closing or mass layoff"). Thus, it was not certain that defendants would have been liable under the statute.

we agree that WARN is inapplicable on its face.

### B. WARN's Legislative History

■ Our conclusion that WARN is inapplicable is supported by the statute's legislative history. It would seem anomalous to hold an employer liable under WARN regardless of whether or not the closing was ordered at the direction of a government agency. Thus, although the statute appears to be clear on its face, the legislative history may aid us in determining whether the statute was intended to apply in circumstances such as these. Where application of a statute could lead to possibly anomalous results, a court may properly look to the legislative history for guidance in its application. *See, North Carolina DOT v. Crest Street Community Council, Inc.,* 479 U.S. 6, 14, 107 S.Ct. 336, 341, 93 L.Ed.2d 188 (1986).

The WARN Act was enacted after a long and tumultuous political battle, an exhaustive review of which is not here relevant. Senator Metzenbaum was the prime sponsor of the legislation, originally introducing the bill as the Economic Dislocation and Worker Adjustment Assistance Act, S. 538, 100th Cong., 1st Sess. (1987), an amendment to the Jobs Training Partnership Act, 29 U.S.C. § 1501 *et seq.* (West Supp.1991). The Senate incorporated the bill into the Omnibus Trade and Competitiveness Act of 1987, which was vetoed by President Reagan in 1988, however. It was primarily because of the mandatory employer notice provisions that President Reagan vetoed the bill.[6] Senator Metzenbaum subsequently introduced S. 2527, 100th Cong., 2d Sess. (1988), which was almost identical to the previous bill. The House of Representatives approved of the bill without amendment, and the act ultimately became law when the President let it stand without signature. *See generally,* Note, *The*

*Worker Adjustment and Retraining Notification Act of 1988: Advance Notice Required?* 38 *Cath.U.L.Rev.* 675, 690–93 (1989) (discussing legislative history of WARN and President's decision not to veto the bill).

The most persuasive portion of legislative history which supports the plaintiffs' position took place during a brief colloquy between Senators Reid and Kennedy during the floor debates of the Omnibus Trade Act which, as indicated above, was ultimately vetoed by President Reagan:

> Mr. REID. Thank you, Senator. In Nevada, the State Gaming Authority has the power to order a gaming operation to shut down immediately. Many constituents have voiced their concern to me that such action would obviously preclude them from providing the required 60–day advanced notice and, thus, expose them to the penalties contained in the bill. Could you provide some clarification on this point?
>
> Mr. KENNEDY: Of course. Section 332(b) allows for a reduction in the notice period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required. I would certainly think that in the case of an agency coming in and ordering an immediate shutdown with no warning, the employer could not have foreseen such an action.

133 *Cong.Rec.* S9434, S9435 (daily ed. July 8, 1987). Although this discussion appears to be directly on point, Senator Kennedy's response conflicts with statements made almost one year later during debate of the bill which was ultimately enacted.

Senators Gramm and Nickles unsuccessfully sought to amend the bill by excluding from the definition of "employer" any bank or savings and loan association that is in danger of closing by the Federal Deposit

---

6. *See,* President's Message to the House of Representatives Returning Without Approval the Omnibus Trade and Competitiveness Act of 1988, 24 *Weekly Comp.Pres.Doc.* 655–57 (May 24, 1988). The President surmised that the bill would cost jobs and damage the nation's economic growth since mandatory notification could actually force a faltering business to close. Although the President recognized that there was a "faltering business" exception, he concluded that this provision was too ambiguous to be workable and invited untold litigation. *Id.* at 656.

Insurance Corporation or the Federal Home Loan Bank Board, respectively. S.Res. 2437, 100th Cong., 2d Sess., 134 *Cong.Rec.* S8614, S8621 (daily ed. June 27, 1988). Senator Gramm explained that although the FDIC believed that the bill did not apply to them, Congress should resolve any doubt by enacting the proposed amendment. *See,* 134 *Cong.Rec.* at S8622. He noted that "it is no mystery to anybody" that many of the nation's savings and loans are experiencing deep financial difficulties and thus "[n]obody can claim that these problems, in the language of the bill, are unforeseen and unexpected economic difficulties. These are problems that have existed for months and years." *Id.*

Senators Proxmire and Metzenbaum rose to oppose the amendment since, in their view, the amendment was unnecessary. Senator Metzenbaum explained:

> [T]he amendment seems to reflect concern that advance notice might interfere with [the] ability of [the] Federal Deposit Insurance Corporation or [the] Federal Home Loan Bank Board to step in and close banks that are in danger of closing or failing; [b]ut the amendment is unnecessary, because as the chairman of the Banking Committee has already pointed out, the bill does not cover that situation at all.

> The bill requires notice to be given by employers. But when the appropriate banking agency moves in to close a bank, the closing is by the Federal Government, not by the employer itself.

> The government action in such a situation is analogous to police closing down a gambling operation or public health authorities closing down a restaurant that violates the health code. The bill on its face simply does not apply.

134 *Cong.Rec.* at S8624. In response to similar arguments asserted by Senator Proxmire, Senator Gramm acknowledged that the bill as written would not apply to institutions closed by the FDIC or FHLBB. However, he urged that it would be wiser to exempt troubled banks and savings and loans and allow them to consolidate (and possibly close down branches) before the

federal agency was required to close the institution, than "to just have it go broke to be exempted from this law[.]" *Id.* at S8623.

Thus, although the two situations discussed above both involved government-ordered closings, during debate of the Gramm amendment it was agreed by both the sponsors and opponents of the amendment that the statute would be entirely inapplicable in this situation. This contrasts with Senator Kennedy's statement that the statute would apply, although the employer may be entitled to reduced notice under the unforeseen business circumstances exception. To the extent the legislative history is conflicting in this regard, we find the statements made during the Gramm amendment debates more indicative of Congressional intent since the discussion was more thorough than the single inquiry addressed by Senator Kennedy, and additionally, included relevant remarks by the sponsor of the legislation. *Cf. Carlin Communications, Inc. v. F.C.C.,* 749 F.2d 113, 116 n. 7 (2d Cir.1984) ("[w]hile the views of a sponsor of legislation are by no means conclusive, they are entitled to considerable weight"); *see also, DeVargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377, 1386–87 (10th Cir.1990) (in analyzing legislative history, statements by individual legislator should not be given controlling effect). Thus, the floor debates indicate that Congress did not intend for WARN to apply in cases of government-ordered closings, such as where the FHLBB closes a savings and loan institution, or where a state department of health closes a restaurant. We conclude that the government-ordered closing in this case is sufficiently analogous to the type of closing that Congress contemplated would not trigger an employer's liability under WARN.

## C. Department of Labor Regulations

The Department of Labor (DOL) addressed the issue of government-ordered closings in the comments to its proposed

rules.[7] The DOL, citing Senator Kennedy's remarks discussed above, states "that some government-ordered closings may constitute unforeseeable business circumstances to which reduced notice applies." 54 Fed.Reg. 16042 (1989). However, the DOL has drawn a distinction between an *employer's* decision to shut down operations as a result of governmental regulation, and the *government's* decision to shut down an employer; the DOL indicating that the employer would be liable under WARN in the former case, but not the latter:

> Some commenters discussed several types of governmental actions which they argue should be treated as government ordered closings. DOL agrees that those closings which are the direct result of governmental action and which occur without notice should be counted as government ordered closings to which after the fact notice is applicable. Examples of such closings would be the closing of a restaurant by a local health department or the closing of a nuclear power plant by the Nuclear Regulatory Commission. Other agencies do not take such direct action. For example, the Occupational Safety and Health Administration and the Environmental Protection Agency take enforcement actions which might result in the closing of a plant by the employer either to remedy the violation or because it cannot continue to operate. These agencies do not, however, directly order the closing of the plant and they usually give some notice of the violation and an opportunity to contest the findings. Such closings, although they may result from an government action, are not government ordered and are not subject to the same treatment. (Depending on the length of the notice given, a claim that the closings qualify for a reduced notice under the unforeseeable business circumstances exception may be available.)....

> The Department notes an important difference between the closings discussed above and the absolute closing of

a savings and loan institution by the FHLBB. The employer can remedy the conditions that caused the closing and reopen the business. In the [case] of an absolute closing or shut-down of a[n] S & L, in contrast, the previous ownership is ousted from control of the institution and the FSLIC assumes control of the enterprise. In this case, there is no employer to give notice and the after the fact notice requirement cannot be imposed, since the S & L employer has been removed.

*Id.*

In this case, although the terms of the conservatorship to an extent enabled both ESA and the Commission to share control of the day-to-day operations of the casino, the final decision to close was made by the Commission. Had ESA determined to close the casino as a result of the Commission's requirements, the comments suggest that defendants would have been required to give sixty days notice under WARN. Here, however, the Commission directly ordered the closing, and to this extent "assume[d] control of the enterprise."

### D. WARN's Purpose

Finally, we do not believe that the purposes of WARN would be furthered by holding defendants liable in this case. The act's stated purpose is to provide

> protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.

20 C.F.R. § 639.1(a) (1990). However, although these avowed goals are furthered in every case in which an employee is fired or laid off, the exceptions indicate that

---

**7.** WARN provides that "[t]he Secretary of Labor shall prescribe such regulation as may be necessary to carry out this chapter." 29 U.S.C. § 2107(a).

WARN imposes an obligation to furnish notice only to the extent that the employer is reasonably able to do so. Thus, implicit in WARN's purpose is an attempt to partially shift to the employer some of the societal costs inherent in plant closings in order to provide a disincentive for the employer to close its facilities. Additionally, notions of corporate social responsibility undoubtedly underlie the requirements imposed upon employers under WARN. *See generally,* Note, *State Plant Closing Legislation: A Modern Justification for the Use of the Dormant Commerce Clause as a Bulwark of National Free Trade,* 75 Va.L.Rev. 845, 858–62 (1989); *but see, Plant Closings: Public or Private Choices?* (R. McKenzie ed. 1984).

The statute contemplates that the employer's facilities will remain open during the sixty-day period before the plant closing or mass layoff. Although the employer may operate at a loss during this period, it will be taking in revenue to offset the loss (unless the loss incurred over sixty days, exclusive of employees' salary and benefits, is anticipated to exceed the cost of sixty days' salary and benefits). However, where a State orders an employer to close under a valid exercise of its police power, the employer is not permitted to remain in business to offset its financial obligation to its employees. Consequently, although notice to plaintiffs would have allowed them some transition time to adjust to the prospective loss of employment,[8] it would have been unreasonable in this case to require defendants to prematurely close its facilities in anticipation of the State's decision to close, in order to comply with the federal plant closing law.

## IV. CONCLUSION

■ Accordingly, considering WARN's language, purpose, legislative history as well as the regulations promulgated under the statute, we conclude that an employer's

---

**8.** As indicated above, the employees were given at least some notice that the casino would close by virtue of Jeanne Hood's 4/15/89 memo.

**9.** *See, Markowitz v. Northeast Land Co.,* 906 F.2d 100, 106 (3d Cir.1990) ("once all claims with an

liability under WARN cannot attach unless the employer rendered the final decision to close the plant. Consequently, we hold that under the facts of this case the defendants may not be held liable under WARN as a matter of law, since it was the New Jersey Casino Control Commission, and not defendants who "order[ed] a plant closing...." Defendants' summary judgment motion will therefore be granted in No. 89–2330 dismissing the First Count of the Second Amended Complaint under WARN for the reasons set forth above, and dismissing the Third Count for breach of contract for lack of subject matter jurisdiction;[9] and in 89–2143 dismissing Counts One through Five of the Second Amended Complaint under WARN for the reasons set forth above.

independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court"). The parties have previously consented to dismissal of the Second Count.