Daniel L. **FINKLER**, et al., on behalf themselves and all others similarly situated, Plaintiffs,

v.

**ELSINORE SHORE ASSOCIATES,** d/b/a Atlantis Casino Hotel, et al., Defendants.

**HOTEL EMPLOYEES RESTAURANT EMPLOYEES INTERNATIONAL UNION LOCAL 54, Plaintiff,**

v.

**ELSINORE SHORE ASSOCIATES** d/b/a Atlantis Hotel and Casino, et al., Defendants.

Civ. Nos. 89–2330, 89–2143.

United States District Court, D. New Jersey.

Jan. 28, 1992.

---

Theodore M. Lieverman, James Katz, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for plaintiffs.

William F. Maderer, Saiber Schlesinger Satz & Goldstein, Newark, N.J., for defendants.

**OPINION**

GERRY, Chief Judge.

These consolidated actions arise out of the May 22, 1989 closing of the Atlantis Casino Hotel in Atlantic City. Plaintiffs are former employees of Atlantis and their representative union. Defendants are Elsinore Shore Associates ("ESA"), a New Jersey partnership that owned and operated the Atlantis; various corporations which make up the partnership; the parent corporation that controls ESA; and two individuals. Plaintiffs have brought claims under the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101 *et seq*, challenging defendants' failure to provide them with the 60 days advance notice of closing required under that act. Defendants moved for summary judgment on the grounds that since this closing was ordered by a state regulatory agency—the Casino Control Commission—rather than by the defendants themselves, they are not subject to the notice requirements of the act, which states, *"an employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice...."* 29 U.S.C. § 2102(a) (emphasis added).

In our opinion of August 20, 1991 we granted defendants' motion, holding that the statute does not apply to closings that are ordered by the government. Today that summary judgment motion comes before us again on plaintiff's motion for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure. Accordingly, we have re-examined our previous opinion, and for the reasons set forth below, we now reverse our earlier holding and deny defendants' motion for summary judgment.[1] 768 F.Supp. 1117.

### I. *Factual Background*

The Atlantis Casino Hotel began to suffer serious financial difficulties in 1985 which eventually led to its demise in 1989.

---

1. Defendants also moved to dismiss plaintiffs' breach of contract claim on the grounds that once the federal claim was dismissed, the court's sole basis for jurisdiction over this pendent state law claim would be removed, thus necessitating its dismissal as well. Since we now uphold plaintiffs' federal claim, our previous order granting defendants' request to dismiss the pendent state law claim will also be reversed.

Chapter 11 bankruptcy proceedings were initiated in 1985 as a result of a 9.2 percent decrease in ESA's gross revenues and a net operating loss by the casino of 8.2 million dollars that year. In 1986 the New Jersey Casino Control Commission ("Commission")[2] renewed ESA's license for one year but began imposing numerous requirements on ESA involving the submission of monthly reports to the Commission regarding ESA's financial stability. For the next two years, the casino's revenues continued to decline, but in spite of these difficulties, ESA was discharged from bankruptcy in September 1988 under an approved plan of reorganization. The Commission continued to renew the casino's license year by year, but also continued imposing strict financial reporting requirements on ESA.

In 1988 the casino's financial health continued to deteriorate and when it came time for the Commission to issue its 1989 license, it declined to do so. After conducting hearings, the Commission decided on April 7, 1989 not to renew the casino's license and to appoint a conservator. The conservator was charged with general oversight responsibilities, pending the sale of the casino. The normal operations of the casino were still conducted by ESA, but the conservator was to have access to all books and records in order to assess and monitor ESA's financial situation, and ESA was not to take any significant actions, such as sale of the property, without first notifying the conservator.

On May 10, 1989, as a result of the casino's worsening financial situation and ESA's failure to make an interest payment to bondholders when due, the Division of Gaming Enforcement ("DGE")[3] filed a petition with the Commission seeking a determination as to whether the casino opera-

tions should be terminated. A hearing was held by the Commission, and as a result, on May 16, 1989 it voted unanimously in favor of closing the casino by 4:00 a.m. on May 22, 1989, having found that the casino could no longer be operated in a sound and businesslike manner. An order was issued to that effect on May 18, 1989. Accordingly, Jeanne Hood[4] sent a memo to all employees on May 16, 1989 announcing the Commission's decision and stating that their positions would be eliminated as of May 22, 1989.

Also relevant to this motion is the fact that negotiations between ESA and Donald Trump for the sale of the Atlantis began in late February or early March of 1991 and culminated in the signing of a purchase and sale agreement on April 14, 1989. Because Donald Trump already held the maximum number of casino licenses allowable under state law, see N.J.S.A. 5:12–82(e), and therefore could not obtain another license to operate the Atlantis as a casino, there had apparently been an understanding between the parties throughout the course of these negotiations that in order for the sale to go through, ESA would have to agree to close the casino. This understanding was also incorporated into the signed agreement. Plaintiffs use this fact to argue that the defendants knew well before May 16, 1991 that the casino would close and thus, could have given notice to their employees earlier.

## II. *The WARN Act*

■ The WARN Act states that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order" to each employee or to

---

**2.** The ownership and operation of casino hotel facilities in Atlantic City are subject to state regulation under the New Jersey Casino Control Act, N.J.S.A. 5:12–1 *et seq.* The Casino Control Commission was created by that statute and charged with responsibility for licensing casinos, promulgating regulations, and otherwise implementing the Act. *See* N.J.S.A. 5:12–63.

**3.** The Division of Gaming Enforcement of the New Jersey Department of Law and Public Safety serves as the investigatory and enforcement

body for all proceedings before the Commission, and prosecutes all proceedings for violation of the Casino Control Act. *See* N.J.S.A. § 5:12–55 *et seq.*

**4.** Jeanne Hood, one of the defendants, was the President and chief executive officer of Elsinore Shore Corporation (one of the corporate partners in ESA) and Chairperson of the ESA Executive Committee.

their representatives. 29 U.S.C. § 2102(a). Certain exceptions to this rule are then specifically enumerated by the statute. Thus, if the closing is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required, or if it was caused by a natural disaster, then the statute allows for a reduction of the notification period. "An employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3).

■ Defendants argue that the statute, which explicitly states that "an *employer* shall not order a plant closing," (emphasis added) is entirely inapplicable to cases such as this in which it was the government, not the employer, who ordered the closing. While this is not an unreasonable construction of the statutory language itself, other factors, most notably the regulations promulgated by the Department of Labor ("DOL"), compel us to conclude that government ordered closings are not entirely exempt from the Act. Rather such closings may often fall within the Act's "unforeseeable business circumstances" exception to the 60 day notice requirement. This distinction between treating government ordered closings as, on the one hand, entirely outside the purview of the Act and, on the other hand, falling within the exception provided for in the Act, is significant. A closing that falls within the exception is still subject to the requirement that *some* notice be given (as much as is "practicable"), and plaintiffs argue that the notice given in this instance was far less than was practicable. We therefore turn to the regulations promulgated under the Act and the legislative history of the Act for further guidance.

## A. The DOL Regulations

The language of the regulations promulgated by the DOL pursuant to the WARN Act clearly indicates an intent that certain government ordered closings be considered within the purview of the Act and treated under the unforeseeable business circumstance exception. Thus, in the context of providing examples of types of closings that may fall within the exception, the regulations state that "[a] government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance." 20 C.F.R. § 639.9(b)(1).

Additionally, in its comments to the proposed regulations, published in the Federal Register, the DOL explicitly addressed and rejected the suggestion made by some commenters that all government ordered closings be exempted from the Act.

> Several commenters ... suggested that an exception for government ordered closings be included in the regulations. *No language recognizing such an exception appears in WARN and the Department is reluctant to create such an exception.* However, some government-ordered closings may constitute unforeseeable business circumstances to which reduced notice applies ... Although this treatment will lead to after the fact notice in some cases, it also will lead to the provision of some notice to workers affected by the closing.

54 Fed.Reg. 16054 (1989) (emphasis added).

The comments then go on to give examples of various types of government ordered closings to which the reduced notice or after the fact notice provisions of the unforeseeable business circumstances exception would apply. They also suggest that one particular type of government ordered closing—"absolute" closings of savings and loan institutions by the FHLBB—might be entirely exempt from the Act.

> The Department notes an important difference between the closings discussed above and the absolute closing of a savings and loan institution by the FHLBB. In the cases discussed above [i.e. government ordered closings that *are* covered by the Act], the employer remains in control of its business. The employer can remedy the conditions that caused the closing and reopen the business. In the [case] of an absolute closing or shutdown of a[n] S & L, in con-

trast, the previous ownership is ousted from control of the institution and the FSLIC assumes control of the enterprise. *In this case, there is no employer to give notice and the after the fact notice requirement cannot be imposed, since the S & L employer has been removed.* *Id.* (Emphasis added.)

Thus, the language of the regulations together with the DOL's comments make clear that all government ordered closings are not exempt from the statute. The comments indicate that one particular type of government ordered closing may be entirely exempt: the closing of a savings and loan institution by the FHLBB. Closings by the FHLBB, however, represent a special circumstance in that "the previous ownership is ousted from control of the institution and the FSLIC assumes control of the enterprise." The DOL clearly distinguishes this *special* case of FHLBB closings from government ordered closings in general, and indicates that most government ordered closings should be treated under the unforeseeable business circumstance exception.

■ Regulations that are substantive and promulgated by an agency pursuant to statutory authority have the force of law, *Chrysler Corp. v. Brown,* 441 U.S. 281, 301–303, 99 S.Ct. 1705, 1717–18, 60 L.Ed.2d 208 (1979); *United States v. Walter Dunlap & Sons, Inc.,* 800 F.2d 1232, 1238 (3d Cir.1986), unless they are irreconcilable with the "clear meaning of the statute, as revealed by its language, purpose, and history." *Southeastern Community College v. Davis,* 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) (quoting *Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979)). We find that these requirements are met here. The WARN Act specifically directed the DOL to "prescribe such regulations as may be necessary to carry out this Act." 29 U.S.C. § 2107. Additionally, since the definition of the types of closings that fall under the Act "affect[s] individual rights and obligations," these regulations can be said to "substantive." *Chrysler* 441 U.S. at 302, 99 S.Ct. at 1718 (quoting *Morton v.*

*Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974)). Finally, although the language of the statute itself can be read to support the interpretation urged by the defendants—that it is inapplicable to all government ordered closings—it is also not unsusceptible to the interpretation indicated by the DOL's regulations. Therefore, we consider these regulations to have the force of law and are accordingly bound by them in our interpretation of the statute.

### B. Legislative History

Both parties quote from the legislative history of the WARN Act in support of their positions. Plaintiffs point to the following exchange between Senators Reid and Kennedy which took place when WARN was being debated as part of the Trade Bill in 1987, to support their contention that a closing ordered by a state gaming authority should be treated under the unforeseeable business circumstance exception.

Mr. Reid: In Nevada, the State Gaming Authority has the power to order a gaming operation to shut down immediately. Many constituents have voiced their concern to me that such action would obviously preclude them from providing the required 60–day advanced notice and, thus, expose them to the penalties contained in the bill. Could you provide some clarification on this point?

Mr. Kennedy: Of course. Section 332(b) allows for a reduction in the notice period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required. I would certainly think that in the case of an agency coming in and ordering an immediate shutdown with no warning, the employer could not have foreseen such an action.

133 *Cong. Rec.* S9435 (1987).

Defendants, on the other hand, point to a statement made by Senator Metzenbaum in response to an amendment which would have explicitly excluded from the definition of "employer" any bank or savings and

loan association that is in danger of closing by the FHLBB. Metzenbaum successfully opposed the amendment on the grounds that it was unnecessary because the bill as written already excluded such situations.

[T]he amendment seems to reflect concern that advance notice might interfere with [the] ability of [the] Federal Deposit Insurance Corporation or [the] Federal Home Loan Bank Board to step in and close banks that are in danger of closing or failing; [b]ut the amendment is unnecessary, because as the chairman of the Banking Committee has already pointed out, the bill does not cover that situation at all.

The bill requires notice to be given by employers. But when the appropriate banking agency moves in to close a bank, the closing is by the Federal Government, not by the employer itself.

The government action in such a situation is analogous to police closing down a gambling operation or public health authorities closing down a restaurant that violates the health code. The bill on its face simply does not apply.

134 *Cong. Rec.* S8624 (1988).

Defendants use this statement, specifically regarding bank closings by the FHLBB, to argue that all government ordered closings are exempt from the Act.[5] We prefer an interpretation that is consistent with *both* excerpts from the legislative history as well as the regulations promulgated by the DOL: FHLBB closings are exempt, but other government ordered closings generally are not.

Therefore, based on our reading of the language of the WARN Act in conjunction with the Department of Labor regulations and the legislative history, we hold that government ordered closings are not generally exempted from the WARN Act. Such closings are only entirely exempt when they are "absolute," such as the closing of a bank by the FHLBB, where "the previous ownership is ousted from control" and the government "assumes control of the enter-

prise" such that "there is no employer to give notice." 54 Fed.Reg. 16054 (1989). Other government ordered closings are to be treated under the unforeseeable business exception to the Act to the extent that they "were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A).

### III. *Summary Judgment Standard*

The standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56 is a stringent one. Summary judgment is appropriate only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). *See e.g., Hersh v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir. 1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). In determining whether there remain any genuine issues of material fact, the court must resolve all reasonable doubt in favor of the non-moving party. *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismd.,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). Significantly, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### IV. *Issues of Material Fact Remaining*

■ Given our legal holding above regarding the applicability of the WARN Act to government ordered closings, there are only two conceivable routes by which defendants might obtain summary judgment in their favor: 1) by demonstrating that undisputed facts show that the closing of the Atlantis was analogous to the closing of a bank by the FHLBB and thus entirely

---

**5.** Defendants also quote a statement by Senator Proxmire which, like the Metzenbaum statement, refers specifically to bank closings by the

FHLBB. *See* Defendants Brief in Support of Summary Judgment at 10.

outside the purview of the Act, or 2) by demonstrating that undisputed facts show that the closing was not reasonably foreseeable prior to May 16, 1989 and thus that defendants were not bound under the unforeseeable business circumstance exception to give any more before the fact notice than they did. Defendants, however, press their motion only on the first ground, conceding that if that argument is rejected by the court, "[plaintiffs'] arguments regarding the defense of 'unforeseeable business circumstances' must await trial." *Defendants' Reply Brief* at 1. Therefore, only the first issue is presently before this court.

The legislative history quoted above certainly provides some evidence that, in general, Congress intended that closings by state gaming authorities—unlike closings by the FHLBB—were to be treated under the unforeseeable business circumstances exception. *See* Reid–Kennedy exchange, 133 *Cong.Rec.* S9435 (1987). More importantly though, the factual record before us here indicates that, in this particular case, the control over the operation of the casino exercised by the conservator and the Commission was far less comprehensive and absolute than that involved when the FHLBB closes a bank.[6] We therefore find that there are, at the very least, disputed issues of material fact as to whether this closing fits into the limited category of government ordered closings that are so absolute as to be entirely exempt from the WARN Act, and that summary judgment in favor of defendants must accordingly be denied.[7]

No evidence has been proffered by defendants that shows that they were actually "ousted from control" of the casino when the Commission ordered the closing.

Defendants argue in their brief that the order to close by the Commission "completely oust[ed] ESA's management from control over the casino as of that date," Defendants' Reply Brief at 10, but they cite to no part of the record in support of this proposition. In fact, the record presently before us indicates that the appointment of the conservator on April 14, 1989 did not effect an "ouster" of the ESA from control over the casino. Rather, the Commission's order appointing the conservator provided that the conservator was to oversee the operation of the enterprise by ESA in order to ensure compliance with minimum regulatory standards and in order to report back to the Commission, while the actual day to day operation of the casino was left in the hands of ESA.

> [T]he regular and normal operations of the casino hotel shall be conducted by ESA under the general guidance and oversight, but without specific review or approval of the conservator ...
>
> the conservator need not take into his exclusive possession the property of ESA, including all books, records and papers, but such property shall be available to the conservator ...
>
> the conservator is not required to institute or defend any legal actions on behalf of ESA ...
>
> the conservator need not exercise the power to enter into contracts, borrow money or encumber the assets of the ESA ...

Affidavit of William F. Maderer, exhibit B. Indeed, it appears from the record that ESA's ownership and control over the casino continued even after the closing, since the contract for the sale of the Atlantis between ESA and Donald Trump was approved by the Commission on June 20,

6. Additionally, the picture painted by the plaintiffs of the months just before the closing indicates that the defendants may have purposefully maneuvered so as to force the state into a position where they had to order the casino to close, which raises some questions as to who was really the moving force behind the closing.

7. Plaintiffs attached to their motion for reconsideration four additional exhibits which had not been previously submitted to the court.

Since local rule 12(I), governing motions for reargument, explicitly states that counsel is to present to the court matters she believes the court has "overlooked," we are doubtful that these additional exhibits could be properly considered at this juncture. Because we find sufficient basis in the record submitted with the original summary judgment motion to rule in plaintiffs' favor, however, it is not necessary for us to reach this issue.

1989, over a month after the closing. *See* Supplemental Affidavit of William F. Maderer, Exhibit D.

Moreover, in an earlier opinion in this case, denying a motion to dismiss, Judge Cohen rejected a similar argument made by defendants. *See Finkler v. Elsinore Shore Associates,* 725 F.Supp. 828 (D.N.J. 1989). There, defendants argued that when the Conservator was appointed, he essentially usurped ESA's position and became the "employer" for purposes of the WARN Act, and that defendants were thereby discharged of all responsibility under the Act. Based on an examination of the Commission's order appointing the conservator, however, the court held that the conservator did not "fill the role of the employer," *id.* at 831, and therefore did not succeed to the obligations of the WARN Act. Rather, the court observed, the appointment of the conservator had operated to "assure that defendants met minimum regulatory standards, without unduly disrupting day to day operations.... [as was] illustrated by the fact that defendants, and not the Conservator, 'laid off' the employees pursuant to the Commission's order to cease all gaming operations." [8] *Id.* at 832.

Thus, defendants have failed to point to undisputed facts which show that the closing of the Atlantis was a government ordered closing analogous to the closing of a bank by the FHLBB. To the contrary, the record appears to portray a situation in which the government scrutinized and oversaw the operation of the casino but left the private employer in place rather than "ousting" it from control, ultimately ordering the employer itself to take the action necessary to close the casino.

## V. *Conclusion*

Therefore, for the reasons set forth above, defendants' motion for summary judgment is denied.

---

**8.** *See* Memo to employee from Jeanne Hood dated May 16, 1989, Affidavit of William F. Maderer, Exhibit G ("[t]his serves as notice that your employment with the Atlantis will cease as of Monday, May 22, 1989 at 4:00 a.m.").