_____

No. 95-1813
_____

Marjorie Buck, Bryan Hubbard,    *
and Carl Leeson, individually    *
and as representatives of a      *
class of persons similarly       *
situated,                        *
                                 *
          Appellants,            *
                                 *   Appeal from the United States
     v.                          *   District Court for the Western
                                 *   District of Missouri
Federal Deposit Insurance        *
Corporation, as receiver for     *        [PUBLISHED]
the Missouri Bridge Bank, N.A.,  *
                                 *
          Appellee.              *

_____

Submitted:  December 15, 1995

Filed:  February 8, 1996
_____

Before FAGG, Circuit Judge, GARTH,[*] Senior Circuit Judge, and
     WOLLMAN, Circuit Judge.
_____

GARTH, Senior Circuit Judge.


     This appeal requires us to decide a matter of first impres-
sion:  whether the Worker Adjustment and Retraining Notification

_____

[*].   The HONORABLE LEONARD I. GARTH, Senior Circuit Judge
       for the Court of Appeals for the Third Circuit, sitting
       by designation.

-1-

Act (the "WARN Act"), 29 U.S.C. §§ 2101-2109, applies when the Federal Deposit Insurance Corporation (FDIC), pursuant to 12 U.S.C. § 1821(n), organizes a "bridge bank" and then sells the assets of the "bridge bank" to a healthy successor bank. We hold that the WARN Act does not apply in such circumstances. Accordingly, we will affirm the order of the district court granting summary judgment in favor of the FDIC.

I.

On November 13, 1992, the Federal Deposit Insurance Corporation (FDIC), pursuant to 12 U.S.C. § 1821(n), organized the Missouri Bridge Bank, National Association (the "Bridge Bank"), in order to purchase the assets and assume the liabilities of two failed banks, Metro North State Bank ("Metro North") and The Merchants Bank ("Merchants"). The FDIC chose to reduce losses occasioned by these bank failures through the use of a bridge bank because the FDIC had determined that the utilization of a bridge or transition bank presented the "least cost resolution" to the problem. The FDIC has a number of options for resolving a bank failure, including, but not limited to, an immediate liquidation, the sale of the failed bank, or the formation of a transition bridge bank with an eventual sale to a healthy succeeding bank. See, e.g., 12 U.S.C. §§ 1821, 1823, 1831o.

Pursuant to the Competitive Equality Banking Act of 1987, as amended, the FDIC has the authority to establish a bridge bank, which may be owned in whole or in part by the FDIC. In such a case, the bridge bank assumes a failed bank's deposits and other liabilities while acquiring its assets. A bridge bank is chartered by the FDIC, exists for only a limited time, and is used by the FDIC as a transition bank until the FDIC can transfer the assets and liabilities of the failed bank to a healthy institution. See 12 U.S.C. § 1821(n). The bridge bank is funded by the FDIC. The advantage of using a bridge bank is that it provides the FDIC with sufficient time to find a purchaser for failed banks.

Although the FDIC possesses a number of methods for resolving a bank failure, it is statutorily constrained to select the method which is "the least costly to the deposit insurance fund." 12

-2-

U.S.C. § 1823(c)(4)(A)(ii). In the present case, the FDIC, after conducting a thorough analysis and comparison of the cost of various alternatives, see Appendix 187-227, determined that an orderly auction of assets utilizing a transition bridge bank would result in savings over the cost of liquidating the two failed banks, see id. at 197, 209, 211, and would constitute the "least cost" method for resolving these bank failures, id. at 198.

Acting as receiver for Metro North and Merchants,[1] the FDIC transferred certain assets of the failed banks to the Missouri Bridge Bank. The Bridge Bank also assumed certain liabilities of the failed banks, including the insured deposits. The Bridge Bank retained the employees of Metro North and Merchants.

On February 5, 1993, the FDIC Division of Resolutions met with potential acquirers of the Bridge Bank and solicited bids. Ultimately, the FDIC received seven bids for the purchase of the Bridge Bank. The FDIC solicited further bids from the two top bidders, Boatmen's First National Bank ("Boatmen's"), based in Kansas City, Missouri, and First Bank Systems, based in Minnesota.

On April 2, 1993, the FDIC announced that Boatmen's was the winning bidder. Pursuant to a Purchase and Assumption Agreement dated April 23, 1993, Boatmen's purchased certain assets and assumed certain liabilities of the Bridge Bank. Boatmen's offered employment to approximately 400 of the 626 employees of the Bridge Bank.

Plaintiffs Marjorie Buck, Bryan Hubbard and Carl Leeson are former employees of the failed banks.[2] They continued working for the Bridge Bank when it took over both failing institutions. They

---

1. On November 13, 1992, the Missouri Commissioner of Finance ("Commissioner") declared Metro North to be insolvent and appointed the FDIC as the liquidating agent. On November 20, 1992, the Commissioner determined that Merchants was insolvent and appointed the FDIC as the liquidating agent.

2. Buck and Hubbard are former employees of Merchants and were retained by Bridge Bank when it acquired the assets of Merchants. The record does not reveal whether Leeson had worked for Merchants or for Metro North. For ease of reference, we will refer to all plaintiffs throughout this opinion by the name of the first named plaintiff, Buck.

were not offered employment by Boatmen's. On December 22, 1993, Buck sued the FDIC as receiver for the Missouri Bridge Bank under the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. §§ 2101-2109, alleging that Buck had not received the statutorily mandated sixty-day notice of impending job loss.

On August 2, 1994, the parties filed a Joint Stipulation of Facts. The stipulations included:

4. Pursuant to 12 U.S.C. § 1821(n), the Missouri Bridge Bank was to exist for a limited time, as a transition bank, to effectuate a resolution of Metro North State Bank ("Metro North") and Merchants Bank ("Merchants").

* * * *

10. On November 13, 1992, at the time Metro North was closed, [CEO] Dietz spoke to employees of Metro North, and made available to employees a written Message to Employees, and a copy of an FDIC News Release of that date. . . . The Release stated that the FDIC expected to return the bank to the private sector in four to six months.

* * * *

13. On November 20, 1992, at the time Merchants was closed, [CEO] Dietz spoke to employees of Merchants, and made available to employees a written Message to Employees, and a copy of an FDIC News Release of that date. . . . The Release stated that the FDIC expected to return the bank to the private sector in four to six months.

* * * *

30. No formal notification pursuant to 29 U.S.C. § 2101 et seq. (the Worker Adjustment and Retraining Notification Act or "WARN") was served to employees of the Missouri Bridge Bank, to the State dislocated worker unit or to the appropriate unit of local government, by the Missouri Bridge Bank or by the FDIC-Receiver.

On August 5, 1994, the FDIC filed a motion to dismiss Buck's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative for summary judgment. On August 10, 1994, Buck moved for partial summary judgment. On November 30, 1994, Buck also filed a motion to certify the class. On January 13, 1995, the FDIC filed a motion to redefine the proposed class.

On February 22, 1995, the district court entered its order granting the FDIC's motion for summary judgment. The district court's order read:

Accordingly, it is ORDERED that:

-4-

(1) defendant's motion to dismiss or for summary judgment is GRANTED;
(2) plaintiffs' motion to certify a class is GRANTED;
(3) defendant's motion to redefine the proposed class is GRANTED;
(4) all other pending motions are DENIED as moot.

District Court Order (Feb. 22, 1995) at 12.

We will treat the district court's order as an order granting summary judgment rather than a Rule 12(b)(6) dismissal because the district court relied upon materials apart from the complaint. See Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992) (holding that "a motion to dismiss pursuant to Rule 12(B)(6) 'must be treated as a motion for summary judgment when matters outside the pleadings are presented and not excluded by the trial court.'") (quoting Woods v. Dugan, 660 F.2d 379, 380 (8th Cir. 1981) (per curiam)); Sherwood Med. Indus., Inc. v. Deknatel, Inc., 512 F.2d 724, 725 n.2 (8th Cir. 1975).

While we do not rely on matters outside the complaint in ruling on the applicability of the WARN Act to bridge banks, the district court did in resolving the issues presented to the district court. In doing so, the district court had to treat the FDIC motion to dismiss as a motion for summary judgment and apply the relevant standards for summary judgment.[3]

---

3. The standards for dismissing a complaint under Rule 12(b)(6) and the standards for granting summary judgment are substantially different. Compare 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990) with 10 id. §§ 2716, 2725. See also 5A id. § 1366; 10 id. § 2713. Hence an order of the district court granting "defendant's motion to dismiss or for summary judgment," without specifying the particular ruling which disposes of the issue or case is inappropriate, particularly when review is sought. A district court's order should be precise and not leave the reviewing court uncertain as to the district court's basis for disposition or the standard utilized in its ruling.

Orders framed in the alternative such as the order entered here are disfavored. However, inasmuch as we decide only the threshold issue of the applicability of the WARN Act to bridge banks, the district court's form of order does not affect our holding. In the instant case, because we decide the applicability of the WARN Act to bridge banks as a matter of law, and without reference to facts, we attach no significance to the
(continued...)

The district court provided three alternative grounds for its decision: (1) the WARN Act did not apply to a financial institution closed by a government agency; (2) the Bridge Bank fell within the WARN Act exemption for "temporary facilities"; and (3) the complaint was fatally defective because it failed to allege that at least fifty employees at a single site of employment were dismissed. The district court then granted certification of the class as redefined by the FDIC, but denied all other pending motions as moot. Buck filed a timely notice of appeal on March 20, 1995.

## II.

The district court had jurisdiction over plaintiffs' WARN Act claim pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2104(5). We have jurisdiction over the district court's final order dismissing the complaint under 28 U.S.C. § 1291.

We also exercise plenary review over a grant of summary judgment. Hardin v. Hussmann Corp., 45 F.3d 262, 264 (8th Cir. 1995). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We must view the evidence in the light most favorable to the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must demonstrate "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party satisfies this requirement, the burden shifts to the

---

3. (...continued)
distinction between dismissal under Rule 12(b)(6) and summary judgment under Rule 56. If matters of fact were involved, notice to the nonmovant would undoubtedly be required when the district court converted the FDIC's motion to dismiss to a motion for summary judgment.

nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 474 U.S. at 248.

## III.

The Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101-2109, mandates that covered employers[4] provide employees (or their union) sixty days notice of a plant closing[5] or mass layoff.[6] Subject to certain conditions and exceptions, employers generally must notify each "affected employee" or "each representative of the affected employees," as well as certain state government officials. See 29 U.S.C. § 2102(a). An employer who fails to satisfy the statutory notice requirements is subject to civil liability. An "aggrieved employee" may bring a civil action to collect "back pay for each day of the violation . . . and . . . benefits under an employee benefit plan . . ., including the cost of medical expenses incurred during the employment loss which would have been covered under an

---

4. Under the WARN Act, an "employer" is defined as "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime) . . . ." 29 U.S.C. § 2101(a)(1).

5. The term "plant closing" is statutorily defined as "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at a single site of employment during any 30-day period for 50 or more employees excluding any part-time employees . . . ." 29 U.S.C. § 2101(a)(2).

6. A "mass layoff" is statutorily defined as

a reduction in force which --
    (A) is not the result of a plant closing; and
    (B) results in an employment loss at the single site of employment during any 30-day period for --
    (i)(I) at least 33 percent of the employees (excluding any part-time employees); and
    (II) at least 50 employees (excluding any part-time employees); or
    (ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(3).

employee benefit plan if the employment loss had not occurred." 29 U.S.C. § 2104(a)(1). The employer's liability is capped at a maximum of (1) sixty days back pay and benefits or (2) one-half the number of days the employee was employed by the employer, see id., and is reduced by the amount of any wages paid by the employer to the employee during the period, see id. at § 2104(a)(2).

In ruling for the FDIC, the district court held that the WARN Act does not apply to the FDIC's closure of a bridge bank. To reach this conclusion, the district court relied primarily on Office & Professional Employees Int'l Union Local 2 v. FDIC, 138 F.R.D. 325 (D.D.C. 1991), rev'd on other grounds, 962 F.2d 63 (D.C. Cir. 1992) (hereinafter "OPEIU").

In OPEIU, the court dismissed a WARN Act claim against the FDIC as receiver for a failed bank (the National Bank of Washington), reasoning that

> [w]hen the federal authorities take over the bank and shut it down, there is no employer to give notice. The former bank owners do not own the bank; nor did they close the bank. Moreover, the federal government is precisely not an employer if it is shutting the bank down.

Id. at 327.

In an attempt to distinguish OPEIU, Buck notes that in OPEIU, the failed National Bank of Washington, which was shut down by the FDIC, was owned and operated privately, whereas here the Missouri Bridge Bank was owned and operated for a period of time by a government agency, the FDIC. Buck calls particular attention to the fact that in contrast to OPEIU, in the present case the FDIC owned and operated the Bridge Bank until it transferred the Bridge Bank's assets to Boatmen's. Buck argues that OPEIU has no application here because in that case, the FDIC acted only in its capacity as a regulator when it liquidated the National Bank of Washington, whereas in this case, the FDIC acted both as a regulator and as an employer. Thus Buck concludes that as an employer, the FDIC had to comply with the WARN Act.

We are not persuaded by Buck's argument. Buck concedes that the WARN Act would not have come into play if the FDIC had liquidated both Metro North and Merchants in November 1992. Buck

-8-

also agrees that if, as a result of the immediate closing of these two banks, all employees had been terminated, the WARN Act would not have been applicable. In our view, it must therefore follow that Congress intended that the FDIC must _a fortiori_ be able to take a less drastic action (i.e. creating a bridge bank and terminating less than half the work force some five months later) without incurring liability under the WARN Act. Subjecting the FDIC to the strictures of the WARN Act, under the present circumstances, could severely hinder the FDIC's ability to resolve bank failures as efficiently and expeditiously as it did here.

Buck argues, however, that Congress did intend that the WARN Act apply to bridge banks. In support of this proposition, Buck cites to the legislative history of the statute. Specifically, Buck notes that Congress failed to enact an amendment proposed by Senator Gramm, which would have created an express exception for troubled financial institutions closed by government regulators. However, Buck relies on statements made by opponents of the amendment during debates on the measure:

> Employees are not less entitled to notice because their employer is a bank rather than a steel mill or an auto plant. . . .
> . . .
> . . . [F]urthermore, most layoffs under circumstances of a FDIC or FSLIC assisted merger are slow and gradual. The people who are laid off are not suddenly laid off . . . . [M]ost employees are laid off over a period of time . . . .
> Mr. President, where there are more than 50 laid off, I cannot for the life of me understand why bank employees are not like other human beings, why they should not be told in advance . . . .

134 Cong. Rec. at S8,624-25 (June 27, 1988). Buck asserts that Congress's refusal to enact the Gramm amendment, which would have made the WARN Act inapplicable to the FDIC's bridge bank action, evinces a legislative intent to subject the FDIC to the notice requirements of the WARN Act.

To the contrary, we can just as easily read the legislative history to support exactly the opposite proposition. That is, we infer from the legislature's failure to enact an express exemption that such an exemption was unnecessary. In other words, Congress

understood that the WARN Act did not cover the actions of the FDIC in resolving bank failures and thus no additional legislation or amendatory legislation was necessary.

Indeed, Senator Metzenbaum, sponsor of the WARN Act, in arguing against the Gramm amendment, explained:

> [T]he amendment seems to reflect concern that advance notice might interfere with [the] ability of [the FDIC] or [the] Federal Home Loan Bank Board to step in and close banks that are in danger of closing or failing; [b]ut <u>the amendment is unnecessary, because as the Chairman of the Banking Committee has already pointed out, the bill does not cover that situation at all.</u>
>
> The bill requires notice to be given by employers. <u>But when the appropriate banking agency moves in to close a bank, the closing is by the Federal Government, not by the employer itself.</u>
>
> The Government action in such a situation is analogous to police closing down a gambling operation or public health authorities closing down a restaurant that violates the health code. The bill on its face simply does not apply.

<u>Id.</u> at S16,047 (emphasis added).

The comments of the Department of Labor (DOL), the agency charged with enforcing the WARN Act, are also instructive on this point:

> The Federal Home Loan Bank Board (FHLBB) specifically commented on the application of WARN to its activities and those of the Federal Savings and Loan Insurance Corporation (FSLIC) in the current savings and loan (S & L) banking crisis. FHLBB argues that, because of its statutory mandate, it should not be considered an employer when it or the FSLIC closes a bank. <u>The Department agrees that under the statutory scheme of the deposit insurance laws, neither the Board nor the FSLIC, which are exercising strictly governmental authority in ordering the closing, are to be considered as employers.</u>

54 Fed. Reg. 16,042, 16,045 (Apr. 20, 1989) (emphasis added).

Finally, relying on <u>Finkler v. Elsinore Shore Associates</u>, 781 F. Supp. 1060 (D.N.J. 1992), Buck argues that we should analyze FDIC-ordered closures of bridge banks under the "unforeseeable business circumstance" exception of the WARN Act. Under that exception, "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass

-10-

layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A).  If the exception is applicable, an employer must nevertheless "give as much notice as is practicable and . . . give a brief statement of the basis for reducing the notification period."  Id. at § 2102(b)(3). Buck's reliance on Finkler, however, is misplaced.

In Finkler, former casino employees brought a WARN Act claim against the owners of a casino which had been closed by order of the New Jersey Casino Control Commission.  Id. at 1061. Originally, the district court granted summary judgment in favor of defendants on the grounds that the WARN Act does not apply to closings ordered by the government.  Id.  Upon motion for reconsideration under Federal Rules of Civil Procedure 59(e), the district court reversed its earlier ruling and denied the defendants' motion for summary judgment.  Id.

Contrary to Buck's reading of Finkler, however, the district court in that case did not hold that all government-ordered closings are to be treated under the "unforeseeable business circumstances" exception.  Rather, in discussing various government-ordered closings, the Finkler court explicitly recognized that in situations analogous to the instant bridge bank sale by the FDIC, certain government-ordered closings are entirely exempt from the statute whether or not the closings were foreseeable:

> Therefore, based on our reading of the language of the WARN Act in conjunction with the Department of Labor regulations and the legislative history, we hold that government ordered closings are not generally exempted from the WARN Act.  Such closings are only entirely exempt when they are "absolute," such as the closing of a bank by the FHLBB, where "the previous ownership is ousted from control" and the government "assumes control of the enterprise" such that "there is not employer to give notice."  Other government ordered closings are to be treated under the unforeseeable business exception to the Act . . . .

Id. at 1065 (quoting 54 Fed. Reg. 16,054) (emphasis added).

The DOL, in promulgating its final rule under the WARN Act, also recognized a distinction between "absolute" closings, which are exempt from the Act, and other closings "which are the direct

-11-

result of governmental action . . . to which after the fact notice is applicable." 54 Fed. Reg. 16,054. Specifically, the DOL explained:

> The Department notes an important difference between the closings discussed above and the absolute closing of a saving and loan institution by the FHLBB. In the case discussed above, the employer remains in control of its business. The employer can remedy the conditions that caused the closing and reopen the business. In the cause [sic] of an absolute closing or shut-down of a[n] S & L, in contrast, the previous ownership is ousted from control of the institution and the FSLIC assumes control of the enterprise. In this case, there is no employer to give notice and the after the fact notice requirement cannot be imposed, since the S & L employer has been removed.

Id.

The Finkler court denied the defendants' motion for summary judgment because the defendants had "failed to point to undisputed facts which show[ed] that the closing of the [casino] was a government ordered closing analogous to the closing of a bank by the FHLBB." Finkler, 781 F. Supp. at 1067. That is, the defendants had failed to demonstrate that the operation of the casino exercised by the conservator appointed by the Casino Control Commission was as absolute as the closing of a bank by the FHLBB. Indeed, the district court emphasized: "No evidence has been proffered by defendants that shows they were actually 'ousted from control' of the casino when the Commission ordered the closing." Id. at 1066.

Here, in contrast, the Board of Directors and the management of the Bridge Bank were undeniably and effectively "ousted from control" upon the sale of the assets of the Bridge Bank to Boatmen's, and the closing of the Bridge Bank was without question "absolute." The management of the Bridge Bank could not "remedy the conditions that caused the closing and reopen the business." 54 Fed. Reg. 16,054. Finally, the Bridge Bank ceased to exist as of the date that Boatmen's purchased the assets and assumed the liabilities of the Bridge Bank. In sum, we conclude that the WARN Act does not apply to a circumstance such as this.

-12-

IV.

The FDIC proffers two alternative grounds for affirming the district court's decision: (1) bridge banks, because they are inherently "temporary" in nature, fall squarely within the temporary facilities exemption of the WARN Act, see 29 U.S.C. § 2103(1); and (2) the complaint was properly dismissed because it failed to plead that at least fifty employees at a single site of employment were affected by the reduction in force. Having held that the WARN Act does not apply to the closing of a bridge bank by the FDIC, we need not reach or address these two issues. In addition, because neither party challenged the district court's certification of the class, we do not address that aspect of the district court's order either.

VI.

For the foregoing reasons, we will affirm the February 22, 1995 order of the district court which ruled in favor of the FDIC on the ground that the WARN Act did not apply to the Missouri Bridge Bank.


A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.