## HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION LOCAL 54

### v.

ELSINORE SHORE ASSOCIATES d/b/a Atlantis Hotel and Casino; Elsinore Corporation; Elsub Corporation; Elsinore of Atlantic City; Elsinore of New Jersey, Inc. (D.C. Civil No. 89–02143).

Daniel L. Finkler; Doreen Vitalo; Frank Franceschini; John M. Le-Grand; Kenneth Arthur; Christine Bednarski; Jean Bruno; Paulette Chapman; Denise Lynne Crowe; Jerry Fisher; Al Glenn; Linda Pasquale Krause; Cheryl McCarty; Joseph Manno; Leon A. Sarao; Barry R. Shapiro; Tom Tavener; Babette Weinstein; Sallie Williamson; Lane F. Yoshida; David Owens; Edward Malesinski; Rose Brennan; Grace Jasper; Arturo Barrera; Lorrie Lennox; Ronald J. Sohl, Sr., on behalf of themselves and all others similarly situated

### v.

Elsinore Shore Associates, d/b/a Atlantis Casino Hotel; Elsub Corporation; Elsinore of Atlantic City; Elsinore of New Jersey, Inc.; Elsinore Finance Company; Elsinore Corporation; Jeanne Hood (D.C. Civil No. 89–02330),

Local 54, Hotel Employees and Restaurant Employees International Union, Appellant at No. 97–5789,

Local 54, Hotel Employees and Restaurant Employees International Union; Daniel L. Finkler; Doreen Vitalo; Frank Franceschini; John M. Le-Grand; Kenneth Arthur; Christine Bednarski; Jean Bruno; Paulette Chapman; Denise Lynne Crowe; Jerry Fisher; Al Glenn; Linda Pasquale Krause; Cheryl McCarty; Joseph Manno: Leon A. Sarao; Barry R. Shapiro; Tom Tavener; Babette Weinstein; Sallie Williamson; Lane F. Yoshida; David Owens; Edward Malesinski; Rose Brennan; Grace Jasper; Arturo Barrera; Lorrie Lennox; Ronald J. Sohl, Sr., on behalf of themselves and all others similarly situated, Appellants at No. 98–5116.

Nos. 97–5789, 98–5116.

United States Court of Appeals, Third Circuit.

Argued Sept. 14, 1998.

Decided March 31, 1999.

Theodore M. Lieverman, (argued), Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano, Cherry Hill, New Jersey, for appellants.

William F. Maderer, (argued), Saiber, Schlesinger, Satz & Goldstein, Newark, New Jersey, for appellees.

Before: SLOVITER, SCIRICA and ALITO, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This case involving an interpretation of the Worker Adjustment and Retraining Notification Act, 29 U.S.C.A. § 2101 *et seq.* (Supp.1998), arises from the closing of the gambling casino at the Atlantis Hotel and Casino by the New Jersey Casino Control Commission. Plaintiffs, former employees of the Atlantis,[1] sued Elsinore Shore Associates, the owner of the Atlantis, claiming that Elsinore Shore Associates' failure to provide them with 60 days' notice of the closing violated the WARN Act. The District Court concluded Elsinore Shore Associates' failure to provide notice was excused by the "unforeseeable business circumstances" exception to the WARN Act. There are two issues on appeal: whether the closing of the Atlantis is subject to the WARN Act and whether the "unforeseeable business circumstances" exception applies to this case. We will affirm.

### I.

#### A.

In the late 1980's Elsinore Shore Associates encountered severe financial problems, suffering massive losses, laying off hundreds of employees and languishing in Chapter 11 proceedings. For these reasons, the Casino Control Commission in 1988 conditioned the renewal of Atlantis's gaming license upon (1) Elsinore Shore Associates' promise to maintain a cash position of $6 million; (2) the agreement of Elsinore Shore Associates' parent Elsinore to provide $5 million in working capital; and (3) Elsinore's agreement to provide Elsinore Shore Associates with an additional $2 million in working capital if Elsinore Shore Associates' combined cash reserves dipped below $7 million. But these measures were unable to stanch Elsinore Shore Associates' losses. Within four months Elsinore Shore Associates exhausted Elsinore's initial $5 million and by February 1989, it began drawing down the additional $2 million, which it exhausted by early April. Also in March, Elsinore Shore Associates' independent auditors reported that Elsinore Shore Associates' financial problems raised "substantial doubt about [Elsinore Shore Associates'] ability to continue as a going concern" for more than one year.

When it became apparent the licensing conditions could not be realized, the Casino Control Commission considered assuming an active role in the Atlantis's operations. On March 6, 1989, the New Jersey Division of Gaming Enforcement, the Casino Control Commission's investigative and enforcement branch, suggested the Casino Control Commission appoint a conservator to oversee the Atlantis's gaming operations and to arrange for the casino's sale. The Division of Gaming Enforcement also recommended the Casino Control Commission deny Elsinore Shore Associates' request for a license renewal. Nevertheless, Elsinore Shore Associates resolved to sell the Atlantis before a conservator was appointed and stepped up ongoing negotiations with prospective buyer Donald Trump. After the Casino Control Commission denied Elsinore Shore Associates' request for a six-month license on March 28, Elsinore Shore Associates asked for a two-year li-

---

1. Plaintiffs are Hotel Employees and Restaurant Employees International Union Local 54 and also a class of non-union employees.

cense and attempted to demonstrate its financial viability for that period.

On April 7, the Casino Control Commission refused to renew Elsinore Shore Associates' license, declaring it would choose a conservator to oversee the Atlantis. Seven days later the Casino Control Commission appointed attorney Joseph Nolan as conservator. Moments before Nolan's appointment became effective, Elsinore Shore Associates signed an agreement to sell the Atlantis Hotel to Donald Trump. The agreement provided for the sale to be completed within 60 to 85 days and made closing the casino a condition of the sale. The conservator immediately objected to the agreement and began searching for a buyer who would pay a higher price than Trump. Supporting the conservator, the Casino Control Commission prohibited Elsinore Shore Associates from completing the sale. On April 18, Elsinore Shore Associates agreed to keep the Atlantis Hotel open until the sale was completed but told its employees that it could make "no firm plans" until the Trump agreement was approved. From April 18 until the end of the month, events slowed as the conservator continued to look for a buyer.

The uneventful second half of April gave way to a chaotic May. By May 8, it became clear that Elsinore Shore Associates' cash position would remain below the Casino Control Commission-imposed level for at least the rest of the month. Two days later, the Division of Gaming Enforcement petitioned the Casino Control Commission for a hearing to determine whether the Atlantis should be closed. On May 12, the Casino Control Commission commenced hearings. Four days later, on May 16, the Casino Control Commission ordered the Atlantis to close effective May 22, 1989. Immediately after the Casino Control Commission's order, Elsinore Shore Associates informed its employees of the closing and the elimination of their jobs. *See*

*Finkler v. Elsinore Shore Assocs.*, 781 F.Supp. 1060, 1062 (D.N.J.1992).

### B.

On May 18, 1989, plaintiffs brought suit in District Court, alleging that Elsinore Shore Associates' failure to give 60 days' notice of the Atlantis closing violated the WARN Act. Elsinore Shore Associates responded that the Casino Control Commission's closing was not an employer-ordered closing and therefore was not subject to WARN. In 1991, the late Chief Judge Gerry found WARN did not apply to government-ordered closings and granted defendants summary judgment. *Hotel Employees Local 54 v. Elsinore Shore Associates,* 768 F.Supp. 1117 (D.N.J.1991). Looking at the plain language of the statute, he held that WARN applies only when "the *employer* orders the closure," *id.* at 1123, adding that WARN's legislative history revealed that "Congress intentionally identified the employer as the entity which must order the closing ... in order to be held accountable under the statute."[2]

Turning to the Department of Labor regulations, the District Judge noted they subjected most government-ordered closings to WARN, but exempted closings by the Federal Savings and Loan Insurance Corporation when it " 'assumes control' " over a bank. *Id.* at 1126 (quoting 54 Fed. Reg. 16,042). Finding "the Commission directly ordered the closing, and to this extent 'assume[d] control' of the enterprise," the District Judge concluded that Elsinore Shore Associates' termination fit within this exemption. *Id.* (quoting 54 Fed.Reg. 16,054). Moreover, the District Judge said he did "not believe purposes of WARN would be furthered by holding [Elsinore Shore Associates] liable in this case." *Id.* Stating that WARN's purpose was to protect workers by providing them

---

**2.** The court also cited a statement of Senator Metzenbaum, one of the bill's sponsors, that WARN does not apply to government-ordered closings such as where a state department of health closes a restaurant. *See* 768 F.Supp. at 1125.

with 60 days notice of a plant closing or mass layoff, he found that although

> notice to plaintiffs would have allowed them some transition time to adjust to the prospective loss of employment, it would have been unreasonable in this case to require defendants to prematurely close its [sic] facilities in anticipation of the State's decision to close, in order to comply with the federal plant closing law.

*Id.* at 1127 (footnote omitted).

On reconsideration one year later, the District Judge vacated his grant of summary judgment, holding that WARN applies to government-ordered closings unless the government ousts the employer from control. *See Finkler v. Elsinore Shore Assocs.,* 781 F.Supp. 1060, 1063–65 (D.N.J.1992). He retreated from his reliance on WARN's plain language, finding that "other factors, most notably the regulations promulgated by the Department of Labor ..., compel us to conclude that government ordered closings are not entirely exempt from the Act." *Id.* at 1063. Determining that "the language of the regulations ... clearly indicates an intent that certain government ordered closings be considered within the purview of the Act", *id.* at 1064, he noted that the Department of Labor had explicitly considered and rejected the exemption of all government-ordered closings, observing that the regulations place only one kind of government-ordered closing outside WARN: "the closing of a savings and loan institution by the FHLBB [Federal Home Loan Bank Board]." *Id.* at 1064. He rejected the contention that the Department of Labor regulations conflicted with Senator Metzenbaum's floor statement because Senator Metzenbaum only discussed FHLBB bank closings. The District Judge then advanced an interpretation he thought was consistent with both the legislative history and the regulations: "FHLBB closings are exempt, but other government ordered closings generally are not." *Id.* at 1065. But then he broadened

the exemption beyond banks to exempt all " 'absolute' [closings] ... where 'the previous ownership is ousted from control' and the government 'assumes control of the enterprise' such that 'there is no employer to give notice.' " *Id.* (quoting 54 Fed.Reg. 16,054 (1989)). Finding that the Casino Control Commission's "control over the operation of the casino ... was far less comprehensive and absolute than that involved when the FHLBB closes a bank" and that Elsinore Shore Associates was never ousted from control of the Atlantis, the District Judge held the closing of the Atlantis subjected Elsinore Shore Associates to the requirements of the WARN Act. *Id.* at 1065–67.

After Chief Judge Gerry's death, the case was assigned to Judge Simandle. Following a bench trial, the District Court refused to reconsider the prior ruling that certain government-ordered closings fell within the scope of WARN. Pronouncing the scope issue a "close question," the District Court concluded that the law of the case doctrine prevented it from disturbing the prior decision.

Nonetheless, the District Court held that Elsinore Shore Associates' failure to provide 60 days' notice of the closing did not violate WARN because the Casino Control Commission's order was an unforeseeable business circumstance. Specifically, the District Court found that as of March 23, 1989—60 days before the closing—it was not reasonably foreseeable that the Casino Control Commission would order the closing of the Atlantis on a certain date or within a 14-day window. Instead, the court found that on March 23, a reasonable employer would have foreseen either that the Casino Control Commission would renew the Atlantis's license or that it would appoint a conservator to oversee the Atlantis's gaming operations. It based this finding on several factors: Elsinore Shore Associates' renewal application, the Casino Control Commission's practice of never having refused to renew a casino license, the Division of Gaming Enforce-

ment's recommendation that the Casino Control Commission appoint a conservator and the conservator's statutory obligation to preserve the Atlantis's assets so that it could remain open. Further, the District Court found that on March 23, 1989, it was also reasonably foreseeable that the Atlantis would be sold to a purchaser who would continue its gambling operations, citing the attractiveness of the Atlantis's gaming license, its excellent facilities, its rock-bottom price and the number of interested potential purchasers.

The District Court also held that none of the events between March 23 and May 16 made the Casino Control Commission's order to close reasonably foreseeable. In reaching this conclusion, the court evaluated each event that plaintiffs claimed made the closing foreseeable. It found that the Casino Control Commission's April 7 refusal to renew the Atlantis's license reinforced the expectation that the Casino Control Commission would appoint a conservator to keep the Atlantis open until it could be sold. The April 13 appointment of Joseph Nolan as conservator, therefore, made it even more likely that the Atlantis would remain open until its sale. The District Court rejected the contention that the mid-April Elsinore Shore Associates/Trump sale agreement (with its condition that the Atlantis casino close before the sale of the hotel was consummated) made closing reasonably foreseeable because Nolan and the Casino Control Commission immediately blocked the sale. Finally, the District Court found the Division of Gaming Enforcement's May 10 recommendation that the Casino Control Commission close the Atlantis did not make the Casino Control Commission order foreseeable because Nolan urged the Casino Control Commission to keep the Atlantis open and because it was impossible to predict the date such an order might take effect.

In our review of the record, it is clear that the closing of the Atlantis was the direct result of an order from the Casino Control Commission revoking the Atlantis's casino license. The reason for the revocation was the Atlantis's continuing financial troubles. It is also clear that Elsinore Shore Associates made every effort to keep the Atlantis open or to make a commercially reasonable sale of the casino.

## II.

The Worker Adjustment and Retraining Notification Act provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order" to its employees or their representatives. 29 U.S.C.A. § 2102(a) (Supp.1998). This notice must specify, *inter alia*, the projected date of the closing or a 14–day period during which the closing is expected to occur. 20 C.F.R. § 639.7(b) (1998).[3]

WARN's 60–day notice period is reduced or eliminated if the closing or mass layoff is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C.A. § 2102(b)(2)(A) (Supp.1998). This provision, known as the "unforeseeable business circumstances exception," is discussed at length in the Department of Labor regulations and commentary interpreting WARN. The commentary refuses to classify certain types of circumstances as *per se* unforeseeable and suggests that courts examine each case on its own merits to determine whether the employer in the exercise of "commercially reasonable business judgment" could have foreseen the particular circumstances that caused the closing. 20 C.F.R. § 639.9(b)(2) (1998). The regulations do not attempt to define the term "unforeseeable business circumstances," but instead describe "important indica-

---

3. The regulations provide that the notice must specify the "expected date of the first separation" and define "date" in part as "a specific date or ... a 14–day period during which a separation or separations are expected to occur." 20 C.F.R. § 639.7(b) & (c) (1998).

tor[s]" of such circumstances: "sudden, dramatic, ... unexpected ... [and] outside of the employer's control." *Id.* § 639.9(b)(2). Among circumstances that "may be" unforeseeable is the "government ordered closing of an employment site that occurs without prior notice." *Id.* § 639.9(b)(1).[4]

### III.

The District Court had jurisdiction under 28 U.S.C.A. §§ 1331 and 1337 and 29 U.S.C.A. § 2104(a)(5). We have jurisdiction under 28 U.S.C.A. § 1291.

### IV.

### A.

■ We first determine whether the closing of the Atlantis is within the scope of WARN. As with all questions of statutory interpretation, our review is plenary. *United States ex rel. LaCorte v. Smith-Kline Beecham Clinical Laboratories, Inc.*, 149 F.3d 227, 232 (3d Cir.1998). When deciding the meaning of a statute, our task is to "give effect to Congress's intent" with respect to the question at issue. *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir.1998); *see also Sperling v. Hoffmann–LaRoche, Inc.*, 24 F.3d 463, 470 (3d Cir.1994) (a court is bound by its perception of congressional intent). To discern congressional intent, we first consider the statute's plain language. *See LaCorte* at 232; *In re TMI*, 67 F.3d 1119, 1123 (3d Cir.1995).

With this principle in mind, we turn to the language of WARN. The relevant provision is 29 U.S.C.A. § 2102(a), which describes the closings subject to WARN and provides "[a]n employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order." 29 U.S.C.A. § 2102(a) (Supp.1998). On its face, this language could suggest that only employer-ordered closings may be subject to WARN. The statute itself is silent on the subject of government-ordered closings or situations where both the government and the employer play a role in the closing.

Plaintiffs contend that WARN's legislative history demonstrates that Congress intended WARN to apply to government-ordered closings. But the legislative history is inconclusive and contains only two statements that directly address the issue. One suggests that Congress intended WARN to apply to government-ordered closings. When asked by Senator Reid how WARN would apply to unexpected government-ordered casino closings, Senator Kennedy explained that the casino could use the unforeseeable business circumstances exception to avoid liability. *See* 133 *Cong.Rec.* S9434 (1987). The other statement suggests a contrary interpretation. In opposing an amendment which

4. The regulations on the unforeseeable business circumstances provide:

(b) The "unforeseeable business circumstances" exception ... applies to plant closings and mass layoffs caused by business circumstances that were not reasonably foreseeable at the time that 60–day notice would have been required.

(1) An important indicator of a business circumstance that it not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable. A government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance.

(2) The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.

20 C.F.R. § 639.9(b) (1998).

prevented banks from incurring WARN liability after an FDIC-ordered shutdown, Senators Metzenbaum and Proxmire explained that government-ordered closings were beyond the scope of the statute, arguing that "the bill does not cover that situation at all ... [such] a closing is by the Federal Government, not by the employer itself.... The bill on its face simply does not apply." 134 *Cong.Rec.* S16,047 (1988). Arguably, Senator Kennedy's statement may carry more weight because it specifically addresses the casino industry. But Senator Metzenbaum's views may carry the authority normally accorded the views of a bill's sponsor. On balance, however, this sparse and contradictory legislative history is not especially helpful in determining whether Congress intended government-ordered closings to be beyond the scope of the statute.

■ Congress's purpose in enacting WARN may provide more guidance. The WARN Act was adopted in response to the extensive worker dislocation that occurred in the 1970s and 1980s. *See* Richard W. McHugh, *Fair Warning or Foul? An Analysis of the WARN Act In Practice,* 14 Berkeley J.Emp. & Lab.L. 1, 4 (1993). As companies were merged, acquired, or closed, many employees lost their jobs, often without notice. In some circumstances, the projected closing was concealed from the employees. *See* Christopher P. Yost, *The Worker Adjustment and Retraining Notification Act of 1988: Advance Notice Required?,* 38 Cath.U.L.Rev. 675, 676 (1989). Congress enacted WARN to protect workers and their families from these situations. *See* 20 C.F.R. § 639.1(a) (1998). WARN's notice period was designed to allow workers "to adjust to the prospective loss of employment, to seek and obtain alternative jobs and ... to enter skill training or retraining that will allow [them] to successfully compete in the job market." *Id.* The thrust of WARN is to give fair warning in advance of prospective plant closings. It would appear, therefore, that if an employer knew of a government-ordered closing and failed to notify its employees, the WARN Act would apply.

Plaintiffs also contend the Department of Labor implementing regulations and commentary promulgated under 29 U.S.C.A. § 2107 (Supp.1998) (delegating to the Department of Labor the power to "prescribe such regulations as may be necessary to carry out [WARN]") subject government-ordered closings to WARN. As noted, the Department of Labor regulations and commentary place most government-ordered closings within the scope of the statute. Discussing the suggestion that the regulations should exempt all government-ordered closings from WARN, the commentary says "[n]o language recognizing such an [exemption] appears in WARN and the Department is reluctant to create such an [exemption]." 54 Fed.Reg. 16,054 (1989). Instead, the commentary suggests that some government-ordered closings fall within the unforeseen business circumstances exception to WARN's notice provisions. *See id.;* 20 C.F.R. § 639.9(b)(1) (1998). The need to find an exception for a government-ordered closing implies, of course, that such a closing is subject to WARN. Giving a specific example (and tracking legislative history), the commentary states that the government closing of a savings and loan would be exempt from WARN. *See* 54 Fed.Reg. 16,-054 (1989). Whether other types of government-ordered closings are exempt is unclear from the commentary, but it would seem that the exemption should not be limited to that one type.

The regulations appear to contemplate two factors in determining an employer's WARN Act responsibilities: the amount of government involvement in the closing and the amount of notice the employer had of that involvement. The regulations and commentary distinguish among closings involving different levels of government action. Those closings which are the "direct result of governmental action and which occur without notice should be counted as

government ordered closings to which after the fact notice is applicable." 54 Fed. Reg. 16,054. Government-ordered closings which are preceded by some notice "may constitute unforeseeable business circumstances to which reduced notice applies." *Id.* Examples of direct closings are the "closing of a restaurant by a local health department or the closing of a nuclear power plant by the Nuclear Regulatory Commission." *Id.* The Department of Labor observed that "[o]ther agencies do not take such direct action.... These agencies do not ... directly order the closing of the plant and they usually give some notice of the violation and an opportunity to contest the findings." *Id.* These closings can result from, for example, Occupational Safety and Health Administration and Environmental Protection Agency enforcement actions and these agency actions may cause the employer to close a plant either to remedy the violation or because the employer "cannot continue to operate." *Id.* The commentary provides that "[d]epending on the length of the notice given, [indirect] closings [may] qualify for reduced notice under the unforeseeable business circumstances exception." *Id.*

As noted, under the commentary, only one type of government-ordered closing is exempt from the WARN Act: "the absolute closing of a savings and loan institution by the [Federal Home Loan Bank Board]." *Id.* In an "absolute closing," "the previous ownership is ousted from control

of the institution and the FSLIC assumes control of the enterprise." *Id.* In such a closing, WARN does not apply because there is no employer to give notice. But other direct government closings may be less dramatic than the example cited and we do not read the regulations as foreclosing consideration of whether other situations may also be exempt. Indeed, it is difficult to discern the difference between the government closing of a savings and loan institution and the government closing of a nuclear power plant. In both, the government action is direct and final.

■ Although in most respects these regulations are reasonable interpretations to which a court may defer,[5] *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Health Maintenance Organization of New Jersey, Inc. v. Whitman,* 72 F.3d 1123, 1128 (3d Cir.1995), we find them contradictory, at least in part, with respect to government closings. Nonetheless, the statute's purpose and at least part of its legislative history suggest that most government-ordered closings should be subject to WARN. Nor do we find the statutory language sufficiently clear or unambiguous to rule out consideration of the regulations. Although it is not without doubt, we believe closings like that of the Atlantis are better viewed within the framework of the regulations, which further the statute's purpose.[6] In particular, the case can be

---

5. We note that the final Department of Labor regulations were not promulgated until April 22, 1989 and did not become effective until May 22, 1989—the same day the Atlantis was closed. Because we decide that Elsinore Shore Associates may use the unforeseeable business circumstances exception, we need not decide how the date of these regulations affects its duty to warn its employees.

6. In arriving at our conclusion we have considered the only published opinions examining whether WARN applies to government-ordered closings. In *Buck v. FDIC,* 75 F.3d 1285 (8th Cir.1996), the Federal Deposit Insurance Company (FDIC) organized a bridge bank to purchase the assets of two troubled

banks and retained its employees. It then sold the bridge bank to a healthy successor bank which fired the employees of the bridge bank. *See Buck* at 1286–87. The employees sued the FDIC, claiming it had failed to provide them with the notice required by WARN. Stating that the FDIC would not have been subject to WARN liability had it simply liquidated the troubled banks, the court concluded that the FDIC a *fortiori* could not be liable for taking the less drastic action of organizing a bridge bank. *See id.* at 1290. The court also noted that subjecting the FDIC to WARN Act liability could "severely hinder the FDIC's ability to resolve bank failures efficiently and expeditiously." *Id.*

made that the closing of the Atlantis is similar to the direct closings preceded by notice that the commentary suggests are subjected to the WARN Act. *See* 54 *Fed. Reg.* 16,054 (1989).

## B.

■ We next turn to the District Court's determination that Elsinore Shore Associates' failure to provide notice of the Atlantis's closing is excused by the "unforeseeable business circumstances" exception. We apply plenary review to the District Court's "choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Mellon Bank v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991).

WARN does not require an employer to provide sixty days' notice when the closing is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C.A. § 2102(b)(2)(A) (Supp.1998). The District Court held that the Casino Control Commission's May 22, 1989 order to close the Atlantis was not reasonably foreseeable within a 14-day

window on March 23, 1989 or at any other time prior to May 22, 1989. It derived the 14-day window requirement from 20 C.F.R. § 639.7(b), which states that notice must provide a 14-day window during which closing is expected to occur.

Plaintiffs contend the District Court erred in deciding an employer has no WARN Act obligations unless the manner of closing is reasonably foreseeable and the date of closing is reasonably foreseeable within a 14-day period. They assert that the District Court's "manner and timing of closing" requirement frustrates WARN's purpose to provide employees with proper notice of plant closings. It does so, they claim, because an employer will rarely be able to predict precisely how and when a closing will occur and will rarely be under a duty to warn its employees. Plaintiffs also contend the timing and manner requirement is inconsistent with the concept of "reasonable foreseeability." They maintain that "reasonable foreseeability" refers only to the occurrence of a general type of risk and not to " 'the likelihood of the occurrence of the precise chain of events leading up to the injury.' "

In reaching its conclusion, the Eighth Circuit rejected the bridge bank employees' argument that Congressional rejection of an express exemption for troubled financial institutions closed by the government "evinces a legislative intent to subject the FDIC to the notice requirements of the WARN Act." *Id.* at 1290–91. The court reasoned that this failure may have been the result of Congressional understanding that such an exemption was unnecessary and quoted the statement of Senator Metzenbaum, WARN's sponsor, that WARN does not apply to FDIC-ordered bank closings. *Id.* at 1291. The court also quoted the Department of Labor comments interpreting WARN, which state that " 'under the statutory scheme of the deposit insurance laws, neither the [Federal Home Loan Bank Board] nor the [Federal Savings and Loan Insurance Corporation], which are exercising strictly governmental authority in ordering the closing, are to be considered as employers'." *Id.* (quoting 54 Fed.Reg. 16,042, 16,045).

In reaching its result, the Eighth Circuit reviewed *Office & Professional Employees International Union Local 2 v. FDIC*, 138 F.R.D.

325 (D.D.C.1991), *rev'd on other grounds*, 962 F.2d 63 (D.C.Cir.1992), in which the FDIC closed a bank and acted as receiver. The District Court concluded that the FDIC had no WARN Act obligations:

> [The FDIC's] most persuasive argument in favor of dismissal is that WARN does not apply to the closing of a bank by federal authorities. The Court agrees. When the federal authorities take over the bank and shut it down, there is no employer to give notice. The former bank owners do not own the bank; nor did they close the bank. Moreover, the federal government is precisely not an employer if it is shutting the bank down.

*Id.* at 327.

The court held that a government agency cannot incur WARN Act liability when it closes a bank. Furthermore, when the owners of a bank are ousted by the government, they cease to be "employers" within the meaning of the WARN Act and therefore cannot incur WARN Act liability.

These cases involving bank closings present much clearer questions for resolution and are not particularly helpful with our inquiry.

Plaintiffs' Brief at 25 (citing *Suchomajcz v. Hummel Chemical Co.*, 524 F.2d 19, 28 n. 8 (3d Cir.1975)). Plaintiffs argue that WARN applies when it is reasonably foreseeable that a plant will close, even if the manner and time of its closing are not reasonably foreseeable.

■ The regulations state that notice provided under WARN must specify a 14–day period during which closing is expected; by implication, it may be argued that WARN's notice obligations do not accrue unless closing is foreseeable within a 14–day period. Plaintiffs ask that we disregard the 14–day requirement, claiming it opens a loophole that makes the unforeseeable business circumstances exception routinely available. But we agree with the District Court that the regulations are reasonable and require closing to be foreseeable 60 days in advance and within a 14–day window. For this reason, we conclude that an employer may validly assert the unforeseeable business circumstances exception unless closing is foreseeable 60 days in advance and within a 14–day window.[7]

■ We next determine whether the unforeseeable business circumstances exception is available in this case. As noted, the commentary refuses to classify certain types of circumstances as *per se* unforeseeable and suggests that courts examine each case on its own merits to determine whether the employer in the exercise of "commercially reasonable business judgment" could have foreseen the particular circumstances that caused the closing. 54 Fed.Reg. 16,062, 16,062–63 (1989). The regulations do not attempt to define the term "unforeseeable business circumstances," but instead describe "important indicator[s]" of such circumstances: "sudden, dramatic, ... unexpected ... [and] outside of the employer's control." 20 C.F.R. § 639.9(b)(1) (1998). Among circumstances that "may be" unforeseeable is the "government ordered closing of an employment site that occurs without prior notice." *Id.* § 639.9(b)(2).[8]

7. In addition to circumventing the regulations, plaintiffs' approach would raise several potential problems. Because plaintiffs' view might require an employer to provide frequent WARN notice, it could require an economically viable employer to provide notice of a possible—but unlikely—closing. Once the employer's creditors learn of the notice, they may seek to enforce existing debts and become unwilling to extend the employer more credit. In addition, employees may overestimate the risk of closing and prematurely leave their employer, forfeiting (among other things) seniority and unvested benefits. Such behavior by creditors and employees would increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect. Where, as here, a company is struggling to survive financially and where it may be subject to an immediate government shutdown, the timing of closing may be uncertain and unpredictable.

8. The regulations on the unforeseeable business circumstances provide:

(b) The "unforeseeable business circumstances" exception ... applies to plant closings and mass layoffs caused by business circumstances that were not reasonably foreseeable at the time that 60–day notice would have been required.

(1) An important indicator of a business circumstance that it not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable. A government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance.

(2) The *test for determining when business* circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.

20 C.F.R. § 639.9(b) (1998).

When determining whether a closing was caused by unforeseeable business circumstances, we evaluate whether a "similarly situated employer" in the exercise of commercially reasonable business judgment would have foreseen closing. 20 C.F.R. § 639.9(b)(2) (1998). In making this determination, we consider the facts and circumstances that led to the closing in light of the history of the business and of the industry in which that business operated. *See Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1061 (8th Cir.1996) (stating that court determines whether defendant acted "as would reasonable employers within its own market" and analyzing closing of defense contractor in light of the "unique" area of defense contracting); 20 C.F.R. § 639.9(b)(2) (1998) (stating that the employer must "predict[ ] the demands of its particular market" but need not "accurately predict general economic conditions" in evaluating whether closing is reasonably foreseeable); *id.* (stating that employer must exercise the same judgment as a "similarly situated employer"). We follow this approach because the importance of a particular event varies from company to company and from industry to industry. What is a harbinger of disaster in one context may be an everyday occurrence in another.

In the spring of 1989, Elsinore Shore Associates was not without notice that the Casino Control Commission might revoke or fail to renew its license. But on March 23, 1989, it was not reasonably foreseeable the Atlantis would close within 60 days and within a particular 14–day window. Furthermore, it was equally foreseeable that the Atlantis might be closed earlier or considerably later in time or not at all. There was little chance that Elsinore Shore Associates would shut down the casino unilaterally: Elsinore Shore Associates appeared determined to keep the Atlantis open or to sell it to a purchaser who would be able to do so. Furthermore, Elsinore Shore Associates' belief that it could sell the Atlantis to a purchaser was reasonable. As the District Court noted, the Atlantis was an attractive potential purchase. With a gaming license, excellent facilities and a low asking price, it attracted a number of potential purchasers.

Nor was it reasonably foreseeable if or when the Casino Control Commission would close the Atlantis. The Casino Control Commission had never failed to renew a casino license, even for applicants in serious financial distress. Instead, the Casino Control Commission typically used its regulatory powers to impose conditions upon renewal and to supervise casino operations. In early 1989, the Casino Control Commission first considered and then appointed a conservator to salvage the Atlantis operation. Although the Division of Gaming Enforcement's non-renewal recommendation expressed concern about the company's ability to survive for twelve months, it never suggested the Atlantis might be forced to close in the next 60 days and in fact encouraged the Casino Control Commission to appoint a conservator. The significance of the Division of Gaming Enforcement's non-renewal recommendation is weakened because the Casino Control Commission frequently chose not to follow Division of Gaming Enforcement licensure recommendations. The difficulty in predicting if or when the Casino Control Commission would close the Atlantis is buttressed by their past relations. Although Elsinore Shore Associates was in severe financial trouble for many years before 1989, the Casino Control Commission not only renewed its license during those years but also failed to take any action to close the Atlantis.

Moreover, the closing at a particular time was not made reasonably foreseeable by the auditors' early March determination that Elsinore Shore Associates' finances raised "substantial doubt about [Elsinore Shore Associates'] ability to continue as a going concern" for more than a year. As the District Court noted, this conclusion does not reflect an opinion as to Elsinore

Shore Associates' ability to operate for any specific period less than one year. Furthermore, the auditors had made similar statements since 1985.

Plaintiffs suggest that several events between March 23 and May 16 should have made Elsinore Shore Associates aware that closing was foreseeable. We disagree. When the Casino Control Commission refused to renew the Atlantis's license on April 7, stating it would select a conservator to prepare the Atlantis for sale, this "furnished no reason," said the District Court, "for foreseeing that the Commission would order the casino closed ... at any particular time." Moreover, when considering whether to appoint a conservator, the Chairman of the Casino Control Commission surveyed Elsinore Shore Associates' troubled situation and concluded "I, for one, would like to see this operation able to continue in some fashion for some period of time ... [so] that the employees would not lose their status and their continuing employment." On April 13, when the Casino Control Commission appointed a conservator with the duty to preserve the Atlantis's assets, it became even more likely the Atlantis would remain open. It is true that Elsinore Shore Associates' agreement to sell the Atlantis to Donald Trump raised the specter of closing—but only for a few hours. Once the agreement was known, the conservator and the Casino Control Commission immediately blocked the sale. Nor did the Division of Gaming Enforcement's May 10 recommendation that the Atlantis be closed made closing foreseeable. The Division of Gaming Enforcement's recommendation must be balanced against the conservator's strong recommendation that the Casino Control Commission keep the Atlantis open and the Casino Control Commission's historical reluctance to shut down casinos.

## V.

As noted, Elsinore Shore Associates had some notice the Casino Control Commission might revoke or fail to renew the

Atlantis's license in the spring of 1989. The WARN Act requires an employer to give 60 days' notice of the projected date of closing. In the event that an unforeseeable business circumstance arises, the notice period may be reduced or eliminated. The unforeseeable business circumstances exception applies if the employer, in the exercise of commercially reasonable business judgment, could not reasonably have foreseen the closing 60 days in advance and within a 14–day window. For the reasons expressed, this exception applies here.

We will affirm the judgment of the District Court.

ALITO, Circuit Judge, concurring:

I join parts I, II, and III of the opinion of the Court and agree that the judgment of the District Court should be affirmed. I write separately because I believe that the language of the WARN Act unambiguously provides that the Act does not apply at all unless the employer, rather than the government, orders the plant closing.

The WARN Act, on its face, does not apply to government-ordered closings. Title 29 U.S.C. § 2102(a) provides:

> An *employer* shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order....

(emphasis added). And Title 29 U.S.C. § 2104(a)(1) states:

> Any *employer* who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable....

(emphasis added). This language is straightforward and clear—the WARN Act applies only when an "employer" orders a plant closing—and where, as here, the statutory language is unambiguous and does not demand an absurd result, the sole function of a court is to enforce the statute according to its terms. *West Virginia Univ. Hosp. Inc. v. Casey*, 499 U.S. 83, 99, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). That is what we should do in this case. It is undisputed that the Casino Control Commission, a government entity, ordered

the Atlantis to close. Because the government—not the employer—ordered the closing, the WARN Act does not apply.

I see no need to look beyond the statutory language to the legislative history—and in any event I agree with the opinion of the Court that the "legislative history is not especially helpful in determining whether Congress intended government-ordered closings to be beyond the scope of the statute." Maj.Op. at 181. Nor would I defer to the Department of Labor's interpretation of the Act on this point. The Labor Department regulations contemplate that "[a] government ordered closing of an employment site that occurs without prior notice . . . may be an unforeseeable business circumstance," 20 C.F.R. § 639.9(b)(1), and therefore necessarily imply that some government-ordered closings are within the WARN Act's purview. The Department's commentary accompanying its first set of regulations expands on this notion:

> Several commenters . . . suggested that an exception for government ordered closings be included in the regulations. No language recognizing such an exception appears in WARN and the Department is reluctant to create such an exception. However, some government-ordered closings may constitute unforeseeable business circumstances to which reduced notice applies. . . .

54 Fed.Reg. 16054 (1989). The Court's opinion, after recognizing that these regulations are "contradictory, at least in part, with respect to government closings," Opinion at 410–11, does not defer to them under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I agree that the regulations are not entitled to *Chevron* deference, but I reach that conclusion because, in my view, the regulations and commentary cannot be squared with the plain language of the statute, and therefore they are not entitled to any deference.

Finally, I would not rely, as the majority does, on the general purpose of the WARN Act. The pertinent provisions of the Act apply only to employer-ordered closings, and even if I were convinced that Congress harbored some general purpose that was inconsistent with those specific provisions, I would follow the specific language that Congress duly enacted.

In sum, I would hold that the WARN Act simply does not apply to a government—ordered closing, such as the one at issue here. The closing order in this case was clear, unequivocal, and unconditional:[1] "Today, May 16, 1989, the Casino Control Commission has *mandated* the Atlantis Casino Hotel to cease its gaming operations no later than the close of the gaming day on Sunday, May 21, 1989." J.A. 1515 (emphasis added). I would affirm on the basis that the WARN Act, by its plain terms, does not apply to unconditional government-ordered closings like the one at issue here.

---

1. This is not a case where the government order is equivocal or conditional, such as an order by a state liquor authority to stop serving alcohol to minors or be shut down. I do not address the question of conditional government-ordered closings here.